CALIFORNIA ASSOCIATION OF BIOANALYSTS, a California nonprofit corporation, and California Clinical Laboratory Association, a California nonprofit corporation, Plaintiffs,

v.

Peter RANK, Director of the State Department of Health Services, State of California, and the State Department of Health Services, Defendants.

No. CV 82–4347 MRP.

United States District Court, C.D. California.

Dec. 23, 1983.

Weissburg & Aronson, Inc., Peter Aronson, Patric Hooper, Los Angeles, Cal., for plaintiffs.

James E. Ryan, Deputy Atty. Gen., Los Angeles, Cal., for defendants.

## OPINION

PFAELZER, District Judge.

This action seeks to invalidate § 53(9) of California Assembly Bill No. 799 ("AB 799"), which mandated a reduction of Medi-Cal reimbursement rates for laboratory and pathology services by an overall average of 25%. The action also attacks the manner in which § 53(9) was implemented by defendant Department of Health Services of the State of California ("DHS"). Plaintiffs are professional associations whose members are owners and operators of clinical laboratories in California, licensed to provide laboratory and pathology services. DHS is the designated and approved "single state agency" charged with administering California's Medicaid program, "Medi-Cal." Defendant Peter Rank is the Director of DHS.

## I. BACKGROUND

Prior to July 1, 1982, the effective date of AB 799, federal agencies repeatedly had criticized Medi-Cal reimbursement rates for laboratory and pathology services as excessive, and had recommended that DHS reduce these rates. The Department of Finance of the State of California, moreover, had conducted a survey which indicated that 53% of the providers of laboratory and pathology services in California ("laboratories") employed dual pricing practices, billing Medi-Cal at rates approximately 34% higher than those charged physicians for identical services.

As stated in AB 799,[1] "In order to effectuate savings under the Medi-Cal program [for the 1982–83 fiscal year]," § 53 directed

---

**1.** *Reprinted in* 6 West's California Legislative Service 1982, c. 328 at 2281–2326.

DHS to reduce maximum reimbursement rates, and even eliminate coverage, for a wide variety of provider services. For most of these services,[2] DHS was directed to reduce the maximum rates of reimbursement by 10%.[3] Section 53(9), however, directed DHS to

> [r]educe rates of reimbursement for laboratory and pathology services, ... performed by all but hospital inpatient providers, by an overall average of 25 percent ... [with] [r]ates for individual procedures [to] be adjusted by more or less than the overall 25 percent reduction to reflect changes in technology based on appropriate relative value studies.

Section 57(c) of AB 799 authorized DHS to implement the provisions of § 53 by way of emergency regulations effective immediately upon filing with the Secretary of State of the State of California.

On July 30, 1982, DHS issued regulations implementing the § 53 reductions, which went into effect on August 1, 1982. *See* 22 Cal.Adm.Code § 51529. In accordance with the legislative mandate, DHS selected a more current relative value study as the basis for calculating the new maximum reimbursement rates for laboratory and pathology services. Prior to August 1, 1982, DHS calculated maximum reimbursement rates for laboratories by using the 1969 California Relative Value Studies ("CRVS"), published by the California Medical Association. On August 1, 1982, however, DHS began using the 1974 CRVS, which took into account technological changes since 1969, and therefore more accurately reflected the current costs of conducting various tests. This resulted in substantial changes in reimbursement rates for individual laboratory and pathology procedures, independent of the mandated 25% average reduction. In conjunction with that reduction, it caused reimbursement rate reductions for *individual* procedures to fluctuate widely on both sides of the 25% average. For example, reimbursement rates declined by 41% for glucose blood counts and actually increased by 6% for culture screenings.

DHS provided two types of public notice for the reimbursement rates reductions. First, in late July 1982, DHS's fiscal intermediary, Computer Sciences Corporation, published Medical Services Bulletin No. 47. This bulletin, which plaintiffs' members received in early August 1982, gave a detailed description of the emergency regulations implementing the changes in the reimbursement rates. Second, on August 11, 1982, DHS published notice of the emergency regulations in the California Administrative Register. *See* 82 Cal.Adm.Reg. B–11 (August 11, 1982). The notice stated that the effective date of the regulations was August 1, cited the relevant statutory authority, noted the overall 25% reduction, provided a number to call for further information, and gave an estimate of the regulations' proposed revenue effect.

The new maximum reimbursement rates were not established pursuant to the methodology set forth in Attachment 4.19–B of the California State Medicaid Plan ("State Plan"), Cal.Welf. & Inst.Code § 14000 *et seq.*, as it existed prior to July 1, 1982. Attachment 4.19–B specified the procedural requirements for establishing reimbursement rates.[4] As a consequence, DHS for-

---

**2.** Physician and hospital outpatient services, § 53(1); fitting and dispensing hearing aids, § 53(4); acupuncture treatment, § 53(5); portable X-ray services, § 53(6); chiropractic services, § 53(7); dental services, § 53(12); and psychological services, § 53(13).

**3.** The maximum rates of reimbursement for drug dispensing services were to be reduced by 9.6%. AB 799, § 53(8).

**4.** Attachment 4.19–B, as it existed prior to July 1, 1982, provided, in relevant part, as follows:

The methodology utilized by the State Agency in establishing payment rates will be as follows:
(a) The development of an evidentiary base or rate study resulting in the determination of a proposed rate.
(b) The presentation of the proposed rate at public hearing to gather public input to the rate determination process.
(c) The determination of a payment rate based on a [sic] evidentiary base including pertinent input from the public hearing process.

warded to the Health Care Financing Administration ("HFCA"), an agency of the United States Department of Health and Human Services ("USDHHS"), the following proposed amendment to Attachment 4.19–B: "(e) Notwithstanding any other provisions of the State Plan pertinent to methods and levels of reimbursement to providers, rates may be adjusted when required by State Statute." The HCFA received the proposed amendment on August 2, 1982 and approved it on August 20, 1982. The approval purported to be retroactively effective as of July 1, 1982. DHS did not issue public notice of any kind regarding this amendment to the State Plan.

## II. PLAINTIFFS' STANDING

As a threshold matter, defendants argue that because plaintiff associations have alleged harm to *individual* laboratories, as associations they lack standing to represent the interests of their individual members.[5] Defendants correctly point out that as a general principle, a need for individual participation in litigation is enough to defeat associational standing. *See, e.g., Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). However, the application of that principle is untenable here. Plaintiff associations are seeking prospective injunctive relief, not damages on behalf of individual members. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 514–15, 95 S.Ct. 2197, 2213–2214, 45

(d) The establishment of the payment rate through the State Agency's adoption of regulations specifying such rate in the California Administrative Code, Title 22, Division 3, Chapter 3, Article 7 (commencing with Section 51501).

5. Defendants also contend that plaintiffs' failure to exhaust available administrative remedies deprives the Court of jurisdiction over this matter. Contrary to defendants' assertion, California has established no administrative mechanism through which Medicaid providers can present challenges similar to those raised by plaintiffs here. As a consequence, defendants' contention is wholly without merit.

6. While Medicaid providers are clearly not the primary beneficiaries of the Social Security Act, *see, e.g., Case v. Weinberger,* 523 F.2d 602, 607 (2nd Cir.1975), this Court shares the majority

L.Ed.2d 343 (1975). That being so, their standing cannot be disputed. *See Hunt,* 432 U.S. 333, 97 S.Ct. 2434; *Warth,* 422 U.S. 490, 95 S.Ct. 2197.

Defendants make the further argument that even if plaintiffs establish associational standing, only Medicaid recipients have standing to sue for alleged violations of the federal Medicaid laws. This argument is without merit. In order to have standing to assert the violation of a federal statute, a plaintiff must: "(1) suffer an injury in fact; (2) fall arguably within the zone of interests protected by the statute allegedly violated; and (3) show that the statute itself does not preclude the suit." *Fentron Industries, Inc. v. National Shopmen Pension Fund,* 674 F.2d 1300, 1304 (9th Cir.1982). *See also Data Processing Service Organization v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–830, 25 L.Ed.2d 184 (1970). It is clear that plaintiffs have satisfied this triparite test.[6] They therefore have standing to challenge the 25% reimbursement rate reduction under the Medicaid statutes.[7]

## III. REQUIREMENT OF PUBLIC NOTICE

Plaintiffs contend that the 25% rate reduction is invalid because of the state's failure to afford proper notice of two changes in its Medi-Cal program. First, plaintiffs argue that the notice of the 25%

view that such providers are arguably within the zone of interests protected under the statute. *See, e.g., Minnesota Association of Health Care Facilities, etc. v. Minnesota Department of Public Welfare,* 602 F.2d 150, 152 n. 6 (8th Cir.1979); *Edgewater Nursing Center, Inc. v. Miller,* 678 F.2d 716, 718 (7th Cir.1982); *National Union of Hospital & Health Care Employees v. Carey,* 557 F.2d 278, 280–81 (2nd Cir.1977); *Massachusetts General Hospital v. Sargent,* 397 F.Supp. 1056, 1059 (D.Mass.1975). *But see Pennsylvania Pharmaceutical Association v. Department of Public Welfare,* 542 F.Supp. 1349, 1355–56 (W.D.Pa. 1982).

7. A fortiori, they have standing to assert that the enactment and implementation of AB 799 violates their constitutional rights.

reduction provided by DHS failed to satisfy the requirements of 42 C.F.R. § 447.205 (1982). Second, plaintiffs contend that DHS failed to give any notice of the amendment to the State Plan, which exempted legislatively mandated changes in reimbursement rates from ordinary procedural requirements, also in violation of § 447.205.

With respect to the first contention, the Court has concluded that although the notice of the 25% reduction failed to satisfy the requirements of § 447.205, the reduction was not invalidated thereby. As to the second contention, the State Plan Amendment did not trigger the requirements of § 447.205 and therefore is not invalid on the ground of inadequate notice.

### A. *Public Notice of the 25% Reduction*

Plaintiffs argue that DHS's notice of the 25% reduction in rates did not comply with 42 C.F.R. § 447.205. That regulation, with which states participating in the Medicaid program must comply, requires state agencies to "provide public notice of any significant proposed change in its methods and standards for *setting payment rates for services.*" § 447.205(a). The notice must be published before the proposed effective date of the change and appear in one of several listed publications, one of which is a state register. § 447.205(d). Furthermore, the notice must

(1) Describe the proposed change in methods and standards;

(2) Give an estimate of any expected increase or decrease in annual aggregate expenditures;

(3) Explain why the agency is changing its methods and standards;

(4) Identify a local agency in each county ... where copies of the proposed changes are available for public review;

(5) Give an address where written comments may be sent and reviewed by the public; and

(6) If there are public hearings, give the location, date and time for hearings or tell how this information may be obtained.

§ 447.205(c).

A partial exception to the full notice requirements of § 447.205 exists for certain legislatively mandated agency action. This exception is based on the rationale that changes mandated by a legislature "have already gone through a public process," 46 Fed.Reg. 58,679 (1981), and, as a result, the objectives of the notice requirements—i.e., to secure public comment and to promote accountability among decisionmakers—already have been satisfied in the legislative process. Moreover, several of the requirements specified in § 447.205 would be inappropriate in the context of ministerial actions undertaken by agencies implementing the commands of a legislature.[8] In these cases, compliance with only subsection (d) of § 447.205, which requires publication of the proposed change before its effective date, should satisfy the requirement of notice.

Recognizing that detailed notice requirements are often superfluous in situations where a change is legislatively mandated, the court in *Claus v. Smith*, 519 F.Supp. 829, 833 (N.D.Ind.1981), stated that where "no interpretation or discretion [is] required of [an agency] by a given state statute, [the agency] could satisfy its procedural duties by complying with the notice publication requirements of 42 C.F.R. § 447.205(d)...." However, the court stated that, where "a state statute requires interpretation and discretion, [the Agency] must satisfy every notice requirement and every hearing requirement of each statute or regulation...." *Id.* In *Claus*, since the statute involved was of the latter variety, the court required the agency to satisfy the panoply of requirements contained in § 447.205.

---

**8.** These include the opportunity for public comment and reasons why the change is being made.

■ In the instant case, the California Legislature gave DHS fairly wide discretion in implementing the overall 25% reduction. This is evidenced in the disparities found among the various reimbursement rate reductions for individual procedures. Thus, as was the case in *Claus*, compliance with all of § 447.205, not simply § 447.-205(d), was required.[9]

■ The State's public notice failed to satisfy the requirements of § 447.205. Although Medical Bulletin # 47 provided a detailed description of the changes, it is not a publication listed in § 447.205(d) as one in which public notice may be published. Moreover, the Bulletin failed to satisfy several of the requirements of § 447.205(c). The August 11, 1982 state register notice also is defective in several respects. First, it was not published before the proposed effective date. Second, its contents did not meet several of the requirements of § 447.-205(c). Nevertheless, for the reasons discussed below, the reimbursement reduction is valid, at least as of August 11, 1982.

Several courts have applied § 447.205 rigidly, enjoining agency action that failed to satisfy all of the provision's requirements. However, unlike the instant action, the plaintiffs in those cases were recipients, not providers; often were prejudiced by the improper notice; and, perhaps most significantly, did not have actual notice of the proposed changes. For example, in *Jennings v. Alexander*, 518 F.Supp. 877, 890 (M.D.Tenn.1981), the public notice of a proposed reduction in coverage for inpatient hospital care was "affirmatively misleading." Its effect, observed the court, "would certainly have been to discourage comment on the proposal which otherwise might have been forthcoming." *Id.* The court stated that this "tactic was in direct contravention of the policy behind the notice requirement of 'fostering complete in-

formation to the public' ...." *Id.* at 890 (quoting *Philadelphia Welfare Rights Organization v. O'Bannon*, 517 F.Supp. 501 (E.D.Pa.1981), *aff'd mem.*, 681 F.2d 808 (3d Cir.1982)).

Similarly, in *Budnicki v. Beal*, 450 F.Supp. 546 (E.D.Pa.1978), the court enjoined a proposed reduction in Pennsylvania's orthopedic shoe program. The state had failed to provide Medicaid recipients with individual notice at least ten days prior to the reduction, as required by 45 C.F.R. § 205.10(a)(4), the applicable Medicaid regulation. The court stressed the prejudice entailed in non-timely notice. Such a failure, declared the court, "ignores the essential function" of the advance notice requirement, namely, to give "recipients an opportunity to adjust by having notice of a program change before any alteration is effectuated." *Id.* at 551.

In *Michigan Hospital Association v. Department of Social Services*, 555 F.Supp. 675 (E.D.Mich.1983), Medicaid providers challenged the implementation of cost containment measures in Michigan's Medicaid program on the ground that the public notice of the change violated § 447.205. Although conceding that the notice may not have satisfied all of the requirements contained in § 447.205, the court refused to enjoin the program. It noted that a detailed description of the changes had been issued to the plaintiffs in the form of medical bulletins, a factor, the court stated, which "cannot be ignored when considering the requirement with respect to the named plaintiffs." *Id.* at 680. The court also distinguished *Jennings*, which had been cited by plaintiffs, on the ground that "plaintiffs herein ... are not Medicaid recipients..." *Id.* at 680–681. Therefore, the court concluded, "[i]f public notice requirements ... have not been met ..., it is not a claim which the plaintiffs named herein

---

9. While *Claus* demonstrates that DHS was not permitted to waive the requirements of § 447.-205(c), it also demonstrates that plaintiffs' notice argument is extremely narrow. As described above, § 447.205 applies in full in the instant case only because AB 799, § 53(9), conferred discretion on DHS in implementing the reim-

bursement rate reduction. This discretion did not encompass the decision to reduce rates by 25%, which already had been made by the legislature, but was limited to the question of how best to implement the 25% reduction. It is only with respect to this determination that compliance by DHS with § 447.205(c) was required.

have standing to assert under the circumstances." *Id.* at 680.

These courts are consistent in dealing with the problem of failure to satisfy the precise requirements of § 447.205. Where the party to whom the notice was required to be given does not receive actual notice of the measure or is prejudiced by the inadequate notice, courts have readily enjoined the action in question until the agency fully complies with the notice requirements. Where, in contrast, the party has received actual notice of the proposed changes and therefore is able to adjust his behavior or make comments to the same degree as he would have had the notice provisions been fully satisfied, full compliance with § 447.-205 will not be required.[10]

The principles derived from these cases refute all of plaintiffs' challenges to the notice provided of the 25% reduction. Plaintiffs first argue that the notice inadequately described the proposed changes in reimbursement rates and that the notice failed to identify local agencies in which copies of the proposed changes were available for public review. Since Draft Bulletin # 47 fully apprised plaintiffs of the proposed changes, they were not prejudiced by these inadequacies, which were purely technical as to them. As a result, the Court declines to strike down the 25% reimbursement rate reduction on this ground.

The plaintiffs also argue that the reduction is invalid because the notice provided no address to which written comments on the changes could be sent. The absence of an opportunity to comment on proposed changes might be deemed prejudicial in cases in which regulations require a mandatory comment period to precede the effective date of a regulation. *Cf., e.g., Morabito v. Blum,* 528 F.Supp. 252 (S.D.N.Y. 1981) (program enjoined until agency complied with sixty day notice period). However, in December 1981, USDHHS eliminated the thirty day notice period in § 447.205. *See* 46 Fed.Reg. 58,677 (1981). As a result, since DHS intended to implement the changes immediately, the fact that no address was provided clearly did not serve to prejudice the plaintiffs. Moreover, the name and telephone number of a DHS employee were provided in the August 11 state register notice. Plaintiffs could have directed comments to this employee although, as a practical matter, plaintiffs undoubtedly knew the identity of persons and agencies to whom their comments should have been addressed.

■ Finally, plaintiffs argue that the August 11, 1982 notice did not precede the effective date of the reduction. In an order denying a preliminary injunction, this Court held that the reduction did not be-

---

**10.** The importance of actual notice is demonstrated in the federal analogue to the instant case; that is, the failure by a federal agency to publish notice in the Federal Register when required to do so. The Administrative Procedure Act provides in part as follows: "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a)(1). In *United States v. Mowat,* 582 F.2d 1194, 1201 n. 5 (9th Cir.1978), *cert. denied,* 439 U.S. 967, 99 S.Ct. 458, 58 L.Ed.2d 426 (1978), the Ninth Circuit stated that by virtue of § 552(a)(1), "regulations that are unpublished in violation of the Administrative Procedure Act are unlawful only as against those who have no actual or timely knowledge of their contents." In *United States v. Aarons,* 310 F.2d 341 (2nd Cir.1962), Judge Friendly cited a portion of the Legislative History of the APA discussing a provision similar to

§ 552(a)(1). It provides: "If a person has actual notice of a rule, he is bound by it. The only purpose of the requirement for publication in the Federal Register is to make sure that persons may find the necessary rules ... if they seek them. *It goes without saying that actual notice is the best of all notices.* At most the Federal Register gives constructive notice." (Emphasis added.) *Id.* at 348 (quoting Legislative History of the APA, at 415).

Thus, the federal rule is that the adversely affected party cannot challenge an unpublished regulation if he has actual notice of it. Although not dictated by statute, the policies underlying the federal rule should apply in the analogous context of the promulgation of regulations by a state agency. In such a case, it follows, *a fortiori,* that an aggrieved party with actual notice may not be heard to complain when the state agency has failed, not to publish any notice, but rather to provide adequate notice of the change.

come valid until August 11, 1982, when the Department published notice of the changes in the state register. However, under the Eleventh Amendment, this Court lacks jurisdiction to make a retroactive award of sums owed by defendants to plaintiffs' members, where the obligations involved arose prior to any order of the Court, and the sums involved are certain to be paid out of the state treasury. *See Florida Department of Health and Rehabilitative Services v. Florida Nursing Home Association,* 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (per curiam); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

B. *Notice of the State Plan Amendment*

■ Plaintiffs also argue that DHS's failure to provide notice of the amendment to the State Plan violated 42 C.F.R. § 447.-205(a), which, as noted above, requires that public notice be given of "any significant proposed change in [a state's] methods and standards for setting payment rates for services." The change in the State Plan Amendment involved the *procedure* by which reimbursement rates are set, rather than an actual change in these rates. An examination of § 447.205 and its history makes clear that only the latter variety of change is comprehended in the regulation's definition of methods and standards. Thus, the notice provisions of § 447.205 are not triggered by the State Plan Amendment, and plaintiffs' contention on this ground must be rejected.

Section 447.205 does not, by its terms, specify whether the words "methods and standards" encompass changes in a state's procedures for determining the state's level of expenditures under the Medicaid program, or whether they are limited to changes affecting the level of expenditures themselves. Nonetheless, it is clear that USDHHS intended that the words be limited to substantive, not procedural, changes. In explaining a recent revision to § 447.-205, USDHHS defined the terms as follows: "Any change in *rate setting* made by

the Medicaid agency is considered a change in either the method or standard for setting payment rates and is subject to these regulations." (Emphasis added.) 46 Fed.Reg. 58,680 (1981).

This interpretation of the words "methods and standards" is confirmed by a review of the provision's recent evolution. Prior to December 3, 1981, § 447.205(a) provided that a state must give public notice of any change "in the Statewide method or level of reimbursement for a service, if the change is expected to increase or decrease Medicaid payments for that service by 1 percent or more during the 12 months following the effective date of the change." Under this provision, a state was not required to provide public notice of changes affecting the procedural mechanisms for establishing rates; notice was required only for changes affecting a state's Medicaid expenditures.

On December 3, 1981, the HCFA revised § 447.205(a). Although the new regulation deleted the 1% trigger, the HCFA made clear that the regulation's scope remained limited to actual changes in reimbursement, rather than to changes in the procedure for setting rates. In discussing the abrogation of the 1% trigger, the HCFA stated that "[t]his deletion is in the interest of promoting State flexibility. We do not believe it is necessary to set an explicit expenditure threshold above which public notice is required. A requirement that all significant changes be published will be effective in guaranteeing public notice of major changes in reimbursement." 46 Fed. Reg. 58,680 (1981). It is clear that, in amending § 447.205, the HCFA intended to mitigate, rather than exacerbate, the burdens of complying with this regulation. Hence, the promulgation of the State Plan Amendment, which would not have required public notice under the prior version of the regulations, does not require such notice under the current version. *See Mississippi Hospital Association, Inc. v. Heckler,* 701 F.2d 511, 523 (5th Cir.1983) ("Since the amendment would not have required public notice under the former regulation, and since the present regulation was

adopted to reduce the administrative burdens placed on state Medicaid agencies ..., we do not read the current regulation to require public notice").

## IV. EQUAL PROTECTION

Plaintiffs contend that AB 799, § 53 deprives their members of equal protection of the law in two respects. First, they argue that the legislation was unconstitutionally underinclusive, because there was no rational basis for singling out providers of laboratory services for a greater reimbursement rate reduction than was imposed on the other § 53 providers. Implicit in this argument is the proposition that all of these providers were similarly situated, and thus should have been treated equally. Second, plaintiffs maintain that, even assuming that dual pricing provided a rational basis for the challenged classification, the legislation was unconstitutionally overinclusive because it subjected all laboratories to the 25% reduction, while only slightly more than one-half actually engaged in dual pricing.

Plaintiffs base these equal protection challenges on both federal and state law. The state equal protection guarantees are set forth in Article I, § 7 and Article IV, § 16(a) of the California Constitution.[11] The applicable federal guarantee is contained in the Fourteenth Amendment to the United States Constitution.[12] While these guarantees are substantially equivalent, the state equal protection provisions "are possessed of an independent vitality which, in a given case, may demand an analysis different from that which would obtain if only the federal standard were applicable." *Serrano v. Priest,* 18 Cal.3d 728, 764, 135

Cal.Rptr. 345, 366, 557 P.2d 929, 950 (1976), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977). As a consequence, plaintiffs' equal protection contentions must be analyzed under both federal and state precedents.[13]

### A. *Underinclusiveness*

Plaintiffs first argue that AB 799, § 53 violates equal protection by singling out laboratory services for a 25% reimbursement rate reduction, while reducing the rate of reimbursement for other services by only 10%. Since AB 799 falls within the rubric of economic and social welfare legislation, the parties agree that this classification does not offend either the federal or state Constitution as long as it is rationally related to the achievement of a legitimate state purpose. Under this rational basis test, a "serious and genuine judicial inquiry" is required by California law "into the correspondence between the classification and the legislative goals." *Hays v. Wood,* 25 Cal.3d 772, 787, 160 Cal.Rptr. 102, 109, 603 P.2d 19, 26 (1979). The classification, however, "will not be set aside if any state of facts reasonably may be *conceived* to justify it." *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) (emphasis added); *accord, Bakke v. Regents of University of California,* 18 Cal.3d 34, 49, 132 Cal.Rptr. 680, 690, 553 P.2d 1152, 1162 (1976), *aff'd in part, rev. in part on other grounds,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

As noted above, the express purpose of AB 799, § 53 was "to effectuate

---

**11.** Article I, § 7 provides in relevant part: "(a) A person may not be ... denied equal protection of the laws; ... (b) A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens...." Article IV, § 16(a) reads: "All laws of a general nature have uniform operation."

**12.** The Fourteenth Amendment provides, in relevant part: "No state shall ... deny to any person within its jurisdiction the equal protection of the laws."

**13.** It should be noted at the outset of this analysis that the federal courts consistently have upheld the constitutionality of Medicaid reimbursement schemes in the face of equal protection challenges. *See, e.g., Arkansas Pharmacists Association v. Harris,* 627 F.2d 867 (8th Cir. 1980); *Massachusetts General Hospital v. Weiner,* 569 F.2d 1156 (1st Cir.1978); *Yapalater v. Bates,* 494 F.Supp. 1349 (S.D.N.Y.1980), *aff'd per curiam,* 644 F.2d 131 (2nd Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1255, 71 L.Ed.2d 447 (1982).

savings under the Medi-Cal program [for the 1982–83 fiscal year.]" This legislative objective was, without question, legitimate, particularly in light of the then impending budgetary crisis in California.[14] The basis for the challenged classification, according to defendants, was a rational legislative perception that laboratories were receiving excessive reimbursements to a greater degree than were the other § 53 providers. Evidence in the record, of which the legislature conceivably was aware prior to the enactment of AB 799, reasonably substantiates this asserted justification for singling out laboratory services for a greater reimbursement rate reduction than that imposed on other provider services.

In 1978, the United States Department of Health, Education and Welfare ("US-DHEW," now USDHHS) and DHS jointly reviewed Medi-Cal reimbursement rates for laboratories. The results of this review, of which DHS was apprised in August 1978, included the following findings:.

[California] is paying too much for lab tests.[15]

. . . .

... [T]he amounts paid for laboratory services under the Medi-Cal program are consistently higher than the fees which the independent labs charge to physicians. For example, a pap smear with hormonal review, for which Medi-Cal pays up to $11.20 per test, is available to physicians for about $3 per test. Similarly, Medi-Cal pays up to $6.72 for the frequently ordered complete blood count

(CBC). However, this test is available to physicians for about $4.[16]

. . . .

... [T]he maximum amounts allowed by Medi-Cal [are] 20 to 254 percent greater than the prices quoted to physicians. . . . [T]he practice of labs charging Medi-Cal more than physicians for the same service is the rule, rather than the exception, throughout California.[17]

. . . .

... Physicians are charged less by laboratories because ... they are dealing in a competitive environment where the fees are primarily based on the going rates in the market place.[18]

Based on these findings, USDHEW concluded that "[t]here is significant potential for realizing program savings in Medi-Cal laboratory services."[19] To achieve these savings, USDHEW recommended that DHS increase audit and surveillance activities to reduce the incidence of dual pricing, and reduce the maximum reimbursements for laboratories to reflect the prevailing rates for physicians.[20]

In March 1982, USDHHS (formerly US-DHEW) forwarded to DHS a report entitled, "Despite Years of Attention: Clinical Laboratory Tests Still Cost Medicaid/Medicare Too Much." This report noted the prevalence of dual pricing in California and five other states audited, and concluded that the problem of excessive fees still existed in California.[21] In a report issued

---

**14.** Had the Legislature reduced Medi-Cal reimbursement rates for all provider groups by the same percentage, inquiry into the rationality of AB 799, § 53 would be unnecessary. In order to conserve resources, a legislature may reduce Medicaid reimbursement rates to the same degree for all provider groups, without implicating equal protection concerns or running afoul of substantive due process requirements. Such an across-the-board reduction not only is non-discriminatory by definition, but also is inherently rational. The legislature's discretion to reduce rates in such a fashion, however, is not unlimited, since all rate reductions must comply with applicable federal Medicaid standards, including 42 C.F.R. § 447.204, discussed *infra*. *Cf., Mississippi Hospital Association, Inc. v. Heckler,* 701 F.2d 511, 518 (5th Cir.1983) ("budgetary

constraints cannot excuse a failure to comply with federal standards").

**15.** Exhibit 61, p. 1.

**16.** *Id.* at 1.

**17.** *Id.* at 1–2.

**18.** *Id.* at 3.

**19.** *Id.* at 5.

**20.** *Id.* at 6.

**21.** Specifically, USDHHS found:
... [P]rices paid in all but one of the States reviewed (New Jersey) were considerably

later in 1982, the Department of Finance of the State of California ("DOF") voiced similar findings and conclusions.[22]

> more than those charged by laboratories to physicians. The rates established by laboratories for physicians were lower because they were based on free market conditions. Exhibit 54, p. 5.
>
> ....
>
> ... [I]n California we recommended to the State that it adjust the maximum allowances under its Medicaid program to reflect rates available to physicians from independent laboratories. The State issued proposed regulations to reduce some of its maximum allowances, and to strengthen its existing price discrimination prohibitions. Such changes would have produced an estimated $4.1 million savings each year. A hearing was held on these proposed regulations. According to State representatives, they were never issued because of heavy pressure from providers. Thus, the problem still continues in California.
>
> In contrast to this is the situation in New Jersey which had been previously reported in the 1976 Senate investigation and by the GAO.

 Based upon the information in circulation prior to the enactment of AB 799, the Court cannot conclude that it was

> Some years ago the State concluded it was paying too much for laboratory tests. An independent commission had found that such excessive reimbursements resulted in profits which were deemed exorbitant.... As a result of the commission's findings, an across-the-board reduction of 40 percent in allowable payment rates was made in 1975. Laboratories were also prohibited by the State from charging Medicaid higher fees than they charged physicians for the same tests. Medicaid payments in New Jersey for laboratory services are now even less than the charges made by independent laboratories to physicians. Notwithstanding the lower fees allowed, there has been no shortage of laboratories willing to perform tests at the Medicaid rates of reimbursement, according to State representatives. The following schedule illustrates—for five commonly required tests—how much less fees were in New Jersey compared to [the other states audited], as of August 1981. Exhibit 54, p. 6.

### Maximum Fees Under Medicaid

| State | Urinalysis | Sickle Cell Screen | Pap Smear | Complete Blood Count | Chemistry Panel |
|---|---|---|---|---|---|
| NJ | $ 1.20 | $ 1.80 | $ 3.00 | $ 3.00 | $11.00 |
| AL | 7.00 | 5.00 | 10.00 | 10.00 | 20.00 |
| LA * | 5.00 | 5.60 | 9.75 | 9.00 | 36.50 |
| IL | 3.00 | 5.00 | 7.50 | 6.00 | 30.00 |
| CA | 3.96 | 4.62 | 9.90 | 7.92 | 20.82 |
| CN | 3.00 | 3.00 | 5.00 | 8.00 | 12.00 |

\* These amounts were the prevailing rates in the New Orleans area. Exhibit 54, p. 7.

---

Based on these findings, USDHHS concluded:

> [I]mmediate action is called for to curb the excessive charges currently being made against Medicaid and Medicare. States should be alerted to the existence of the discriminatory pricing practices discussed by this report. The strong possibility of substantial savings—such as occurred in New Jersey—should be stressed.
>
> Exhibit 54, p. 11.

22. After reviewing laboratory reimbursement rates for the Medi-Cal program, DOF found that:

> Laboratory providers are employing dual pricing practices. Sixteen of the 30 clinical laboratories [surveyed] (53%) had two pricing schedules—one for the patient (Medi-Cal) and the other one for the client (physician). In every case, the price to the physician was considerably less than what was being billed to Medi-Cal.

Exhibit 53, p. 2.

> ....
>
> DHS has received numerous audit reports since 1977 from HHS, GAO, and the Auditor General. These reports have made recommendations to DHS to reduce the cost to the Medi-Cal program generated by laboratories. DHS has only made a token effort to implement them while many of the conditions continue to exist.
>
> Only since AB 251 and AB 799 mandated action, has DHS invoked any positive corrective measures toward reducing Medi-Cal costs. This lack of aggressive enforcement of state policy to provide quality health care services at the lowest cost possible, is further evidenced by the fact that Medi-Cal pays more for the same laboratory services than do physicians. Prior to August 1, 1982, Medi-Cal paid approximately 34 percent more. This

irrational for the legislature to decide to reduce reimbursement rates for laborato-

difference was reduced to approximately 15 percent after implementation of the new SMA on August 1, 1982.
Exhibit 53, p. 7.

23. At trial, plaintiffs objected to the admission of Exhibits 54 and 61 on the grounds that these federal reports had not been authenticated and contained inadmissible opinions and conclusions. For the same reasons, plaintiffs objected to the admission of Exhibit 59, a 1979 USDHEW report entitled "Lessons Learned Report, Project Integrity II, Laboratories, California," which also noted the existence of dual pricing. The Court thus admitted these exhibits for the limited purpose of establishing the conceivable state of mind of the legislature in enacting the 25% reduction, but left open the question of whether the exhibits could be admitted to prove the truth of their findings.

For a number of reasons, resolution of this question is not necessary to the Court's equal protection analysis. First, even if the exhibits are inadmissible to prove the truth of their findings, the Legislature reasonably could have believed that the findings were true, thus providing a rational basis for singling out laboratories. That the Legislature was conceivably, if not actually, aware of the findings is established by the testimony of Elisabeth Lyman, who served as deputy director of the Health Care Policy and Standards Division at DHS from October 1978 through December 1982. She stated that prior to the passage of AB 799, members of the Legislature had contacted DHS to ascertain why DHS had not taken action on the laboratory audits and reviews which had been conducted by the federal government. See Trial Transcript, volume 3 at 374.

Second, the content of Exhibit 53, the DOF report, in and of itself provides a rational basis for singling out laboratories. Although the report was not published until December 1982, the Legislature conceivably was aware of its findings prior to the passage of AB 799. Plaintiffs did not object to the admission of this exhibit.

Finally, plaintiffs stipulated to the fact that "some laboratories charge Medi-Cal more than they charge physicians for certain laboratory services." Pre-Trial Conference Order, ¶ 5(d), p. 4. Again, this fact, of which the Legislature conceivably was aware, in and of itself provides a rational basis for singling out laboratories. The Court nonetheless wishes to express its view that the reports are admissible as substantive evidence of their content. As a result of the facsimile of the official seal of the USDHHS on its cover page, suggesting that it was printed by authority of that agency, Exhibit 54 is self-authenticating under Rule 902(5) of the Federal

ries more than for the other § 53 providers.[23] The dual pricing practice which had

Rules of Evidence, as well as under Rule 44(a)(1) of the Federal Rules of Civil Procedure. See, e.g., Stewart v. United States, 211 F. 41, 45 (9th Cir.1914); United States v. Aluminum Co. of America, 1 F.R.D. 71, 75 (S.D.N.Y.1939) ("the authenticity of an official document is sufficiently established when a copy of it is offered which purports to have been printed by authority of the Government."); 5 Louisell and Mueller, Federal Evidence, § 533 at 208–09 (1981); 9 Wright and Miller, Federal Practice and Procedure, § 2433 at 388 (1971) ("A document that on its face appears to be an official publication comes under this provision of the rule [Rule 44(a)(1) ] unless the party opposing its admission into evidence shows that it is not in fact an official publication.")

While not self-authenticating under either of the above provisions, Exhibits 59 and 61 have sufficient distinctive characteristics to enable the Court to conclude, under Fed.R.Evid. 901(b)(4), that they are what defendants claim them to be. The reports are on USDHEW letterhead, are signed by officials of that agency, are addressed to Ms. Beverly Myers, the then director of DHS, and were received by DHS. See, e.g., Greenbaum v. United States, 80 F.2d 113, 125 (9th Cir.1935) ("A signature of an employee plus the company's letterhead, together with proof that the letter was mailed by someone, is sufficient" to authenticate that the letter was mailed by the company.); 5 Louisell and Mueller, supra, § 512 at 57–58 (a writing on letterhead paper is sufficient to authenticate the writing under Rule 901(b)(4), "at least in the absence of something highly suspicious in the appearance or content of the letterhead itself or the accompanying written matter, or of counterproof indicating mistake or fraud."); 5 Weinstein & Berger, Weinstein's Evidence, ¶ 901(b)(4)[02] at 901–51 to 901–54 (1982). Moreover, the content of the reports, when considered with the circumstances surrounding their receipt by DHS, is of such a nature that it is unlikely that the reports were prepared by an individual or entity other than USDHEW. See, e.g., Alexander Dawson, Inc. v. National Labor Relations Board, 586 F.2d 1300, 1302 (9th Cir.1978) ("The content of a document, when considered with the circumstances surrounding its discovery, is an adequate basis for a ruling admitting it into evidence."); 5 Weinstein & Berger, supra, ¶ 901(b)(4)[01] at 901–46.

Plaintiffs made no showing that Exhibit 54 was not an official publication or that Exhibits 59 and 61 were not what defendants claimed them to be. As a consequence, authenticating testimony was not required for any of these exhibits.

been employed by more than one-half of the laboratories, and which had resulted in charges to Medi-Cal that were approximately 34% higher than charges to physicians, in and of itself provided a rational basis for treating laboratories differently.[24]

 The fact that other providers could have withstood greater reimbursement rate reductions, as DHS has admitted, does not invalidate AB 799, § 53(9). Plaintiffs made no showing that laboratories could not have withstood greater reductions in their rates as well. Moreover, even if the challenged classification is somewhat underinclusive as a result of the Legislature's failure to reduce the other providers' rates sufficiently to eliminate the evil of their receiving excessive reim-

bursements, under federal law a legislature need not "strike at all evils at the same time or in the same way," but "may implement [its] program step by step, ... adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981). While under California law, legislation is impermissibly underinclusive unless the legislature reasonably could have concluded that the phase of the problem singled out for differential treatment was "the most conspicuous example of the danger it sought to preclude," *Hays v. Wood*, 25 Cal.3d at 792, 160 Cal.Rptr. at 112, 603 P.2d at 29, it was not unreasonable for the legislature to

---

The opinion and conclusion objection to the admission of the reports also lacks merit. The reports come within Fed.R.Evid. 803(8)(C), which provides an exception to the hearsay rule for reports of public agencies "setting forth ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." The prevailing view is that evaluative opinions and conclusions contained in such reports are admissible into evidence as "factual findings." *See, e.g., Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1315–1316 (3rd Cir.1978); *Walker v. Fairchild Industries, Inc.*, 554 F.Supp. 650, 653 (D.Nev.1982); 4 Weinstein & Berger, *supra*, ¶ 803(8)[03] at 803–204 to 803–206. Since there is no evidence suggesting that the reports here lack trustworthiness, their findings, opinions and conclusions thus are admissible.

24. Plaintiffs argue that the dual pricing practice cannot have provided a rational basis for the differential treatment of laboratories, because neither the legislature nor DHS knew whether dual pricing was cost-justifiable. On numerous occasions, however, both federal and state bodies had concluded that there was only a slight cost-justification, if any, for dual pricing. For example, in 1978 USDHEW informed DHS that:

> While there may be merit to the argument that it costs more to handle government claims, neither the Social Security Act nor State statutes contain any authorization to reimburse a laboratory or physician for the administrative processing of claims. Even if they did, the government should not pay the exorbitant amounts being claimed by the laboratories, ostensibly because of their higher administrative costs in processing the claims. For example, a lab submitted one claim to

Medi-Cal for $53.20 and was paid $45.83. The total charges by this lab to a physician for the same tests would have only been $18.45 based on the lab's fee schedule for physicians. Thus, the lab received $27.38 more from Medi-Cal than it would have from a physician. In our opinion, the extra payment of $27.38 to a laboratory simply for the purpose of submitting a single claim to Medi-Cal is unreasonable.

Exhibit 61, p. 3.

Similarly, in 1982, USDHHS notified DHS that:

> Regardless of any merit to this [cost-justification] contention, there was no legislative authorization to reimburse a laboratory for the separate administrative processing of claims. Also, such added expenses could not possibly serve as a valid rationale for the wide disparity in prices charged. In one extreme example, a laboratory in California (a Project Integrity II case) submitted a claim to Medicaid for $117 and was paid $101. The total charges by this laboratory to a physician for the same tests shown on the claim would have only been $14. Thus, the laboratory received $87 more from Medicaid than it would have received from a physician for the submission of a single claim.

Exhibit 54, p. 7.

The legislature, therefore, reasonably and conceivably could have believed that dual pricing was not cost-justifiable. Plaintiffs' contention thus lacks merit, even if the legislature were mistaken in this impression. *See Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979) ("[T]hose challenging the legislative judgment [in a case of this type] must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.")

have viewed the rates at which laboratories were being reimbursed as the most conspicuous example of excessive reimbursement.

## B. *Overinclusiveness*

 Throughout the proceedings, plaintiffs made much of the fact that the 25% reduction is being applied to all laboratories despite the fact that only slightly more than one-half of the laboratories impose dual charges. This uniform reduction, plaintiffs contend, violates equal protection because a legislature may not penalize an entire class to remedy a problem that pertains to only 53% of its members. While legislation may be unconstitutionally over-inclusive under both federal and state law, *see, e.g., Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); *Brown v. Merlo,* 8 Cal.3d 855, 876–77, 106 Cal. Rptr. 388, 403, 506 P.2d 212, (1973), when plaintiffs' argument is examined closely, it is apparent that this legal principle does not apply in this case. It is inapposite because, contrary to plaintiffs' assertions, the 25% reduction does not affect non-dual pricing laboratories to the same degree that it affects those laboratories engaging in dual pricing.

The discussion of this point is, of necessity, somewhat quantitative. Although it is based on averages and may lack mathematical exactitude, it will serve to demonstrate a proposition that should have emerged more sharply at trial: the 25% reduction contained in AB 799 is defensible as a rational response to the perceived problem of dual pricing.

Laboratories engaging in dual pricing set two prices for their services: one fee charged Medi-Cal (the "Medi-Cal fee") and a second, lower fee charged physicians (the "physician fee"). Before the enactment of AB 799, Medi-Cal's maximum reimbursement rate, on the average, fell between these two fees.[25] For purposes of the analysis made here, it is assumed that the single rate charged by non-dual pricing laboratories was equivalent to the lower of the two fees charged by dual pricing laboratories.[26] Thus, Medi-Cal's maximum reimbursement rates, on the average, exceeded the fees charged by non-dual pricing laboratories.

As a consequence, a reduction in the maximum reimbursement rate of 25% reduced the payments received by non-dual pricing laboratories, on the average, by less than 25%.[27] On the other hand, as long as the fee charged to Medi-Cal by a laboratory

---

**25.** That the maximum reimbursement rate generally fell below the Medi-Cal fee is clear from the fact that Medi-Cal reimbursed providers an average of 80% of the amount they billed Medi-Cal. That the maximum reimbursement rate often was greater than the physician fee is clear from the fact that, had this not been true, dual pricing would not have had any effect. These propositions are confirmed by a review of Exhibit 56, which presents the responses to a joint survey conducted in 1981 by the California Clinical Laboratory Association and DHS of the pricing practices of laboratories. Nine laboratories responded to the survey. Of the 52 tests surveyed, the average fee charged Medi-Cal by the laboratories exceeded the maximum reimbursement rate in forty instances. In 33 of the 52 instances, the maximum reimbursement rate exceeded the laboratories' average charge to physicians.

**26.** This assumption is a necessary, though implicit, predicate to the plaintiffs' contention that AB 799, § 53(9), is unconstitutionally overinclusive. For if it is untrue, then § 53(9) may be viewed as focused at no broader a group than

those laboratories engaged in practices found by the legislature to be injurious.

The California legislature may have intentionally directed § 53(9) at a broader group than laboratories engaged in dual pricing. The legislature may have sought to legislate against all laboratories charging the Medi-Cal program fees greater than the competitive rate. While dual pricing may have provided the legislature with the tangible evidence that the Medi-Cal fee was above the competitive one, it may have determined that all laboratories charging rates higher than the physician fee were engaging in the injurious practice. With the perceived evil viewed in this manner, the plaintiffs' argument that § 53(9) was overinclusive dissipates.

**27.** This is so because, as the maximum reimbursement rate is reduced incrementally, it will, at least initially, continue to exceed the physician fee. Until the maximum reimbursement rate falls below the physician fee, any reductions in that rate will have had no effect whatsoever on the fees that may be charged and collected by non-dual pricing laboratories.

was greater than the maximum reimbursement rate (as was the case, on the average, with dual pricing laboratories), a 25% reduction in the maximum reimbursement rate would reduce Medi-Cal payments to that laboratory by the full 25%. Thus, the dual-pricing laboratories appear to be the ones most disadvantaged by the reductions mandated by AB 799, § 53(9).[28]

Given the present state of the record, the precise effect of the 25% reduction on non-dual pricing laboratories is impossible to calculate. However, the record before the Court does seem to indicate that the average reduction with respect to those laboratories will fall well below 25%. The Legislature may have estimated that the effect on the non-dual pricing laboratories would be in the range of 10%, that is, the same reduction borne by the other § 53 providers. Whether or not the 25% reduction succeeded in accomplishing this result is beyond the competence of this Court. Moreover, such a result is not required. *See, e.g., Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) ("Perfection in making the necessary classification is neither possible nor necessary.") (citing *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970)). It is enough, to survive an equal protection challenge, that the result is reasonable and conceivable. *See, e.g., Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. at 466, 101 S.Ct. at 725; *accord Weber v. City Council of Thousand Oaks,* 9 Cal.3d 950, 965, 109 Cal.Rptr. 553, 562, 513 P.2d 601, 610 (1973).[29]

## V. FAILURE TO EXPLICITLY CONSIDER OR MAKE FINDINGS ON EFFICIENCY, ECONOMY AND QUALITY OF CARE

The Medicaid Act (42 U.S.C. § 1396) requires that payments to providers be consistent with "efficiency, economy, and quality of care[.]" 42 U.S.C. § 1396a(a)(30). Neither the Legislature nor DHS explicitly considered and made findings on these factors before enacting and implementing AB 799, § 53(9), respectively. Plaintiffs contend, as a consequence, that the 25% reimbursement rate reduction for laboratories is unlawful.

Although participation in the Medicaid program is optional, "once a State elects to participate, it must comply with the requirements of [the Medicaid Act]." *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). These duties, the *quid pro quo* for the receipt of federal money, "must be set forth unambiguously by Congress and the court must construe [them] strictly." *Pennsylvania Pharmaceutical Association v. Department of*

---

**28.** An example will demonstrate this proposition. The maximum reimbursement rate for a triglycerides test (1974 RVA # 84475) prior to AB 799 was $9.90. The average fee charged physicians by the laboratories surveyed in Exhibit 56 was $5.74 and the average Medi-Cal fee was $11.02. After August 1, 1982, the state reduced the maximum reimbursement rate to $6.72 for this test. Therefore, if a non-dual pricing laboratory charged Medi-Cal the average physician fee, the reduction would have no effect whatsoever on the laboratory. After August 1, 1982, it could continue to charge $5.74 for the test and still be fully reimbursed. The situation with triglycerides is not unique. Of the 22 tests for which the record enables a comparison to be made (the data is available by combining the information contained in Appendix A to Exhibit 53 with that provided in Exhibit 56), the reimbursement reductions implemented in August 1982 would not reduce the payments received by non-dual pricing laboratories in 6 instances. In addition to triglycerides, the tests producing this result were CBC-Electronic (85022); pap smear with Hormonal Rev. (88155); T–3 RIA (83539); Lithium (83725); and Glucose Blood (82947).

**29.** Plaintiffs also contend that AB 799, § 53(9), is unlawful because the Legislature could have achieved the desired savings in the Medi-Cal program by having forbidden laboratories to charge Medi-Cal more than they charge physicians, or by having mandated a system of post-reimbursement audit and collection procedures to ferret out dual pricing. While either of these alternatives may have been a feasible means of achieving the legislative goal of eliminating excessive reimbursements to effectuate cost saving in the Medi-Cal program, the Court cannot substitute its preference for the rational classification selected by the Legislature. *See Schweiker v. Wilson,* 450 U.S. 221, 235, 101 S.Ct. 1074, 1083, 67 L.Ed.2d 186 (1981).

*Public Welfare of Commonwealth of Pennsylvania,* 542 F.Supp. 1349, 1352 (W.D.Pa.1982). The relevant rule of statutory construction is that "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the states can knowingly decide whether or not to accept those funds." *Pennhurst State School v. Halderman,* 451 U.S. 1, 24, 101 S.Ct. 1531, 1543, 67 L.Ed.2d 694 (1981).

Neither § 1396a(a)(30) nor its implementing regulations require a state or its Medicaid agency to explicitly consider and make findings on efficiency, economy and quality of care before setting or implementing reimbursement rates. Rather, § 447.204, "Encouragement of provider participation," the only implementing regulation relevant to this aspect of this case, provides:

> The [state Medicaid] agency's payments must be sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population.

42 C.F.R. § 447.204 (1982). This regulation, the so-called "equal access" regulation,

> does not require that, in order to ensure that undersupplies do not fall disproportionately on medicaid beneficiaries, states set medicaid rates which are price competitive; but ... that, in establishing reimbursement rates, states seek to encourage a sufficient supply of medical services to meet in responsible fashion the needs of medicaid recipients.
>
> . . . .
>
> ... [The] regulation does not require rate parity for medicaid patients even in periods of excess demand for [provider services, but] does require that the reimbursement rate be set sufficiently high to allow some marginal profit in servicing medicaid patients to enough skilled [providers] so as to ensure that medicaid patients have substantial access to [provider services].

*DeGregorio v. O'Bannon,* 500 F.Supp. 541, 547, 550 (E.D.Pa.1980).

No court has held that a state or its Medicaid agency must find that § 447.204 will be satisfied before the state or the agency sets or implements reimbursement rates. Instead, two decisions suggest that if a state's rate structure *in fact* fails to enlist enough providers to conform with § 447.204, recipients *or* providers may bring an action to enjoin utilization of the rate structure until it is upwardly revised. The burden of proof in such an action apparently would lie with the plaintiffs. *See DeGregorio v. O'Bannon,* 500 F.Supp. at 551 (denying recipients' motion for summary judgment on the ground that while, on the record before the court, it did not appear that the state had "given explicit and reasonable attention to the goal of equal access in setting reimbursement rates[,]" it also did not appear that the rates which the state had set would not "in fact, now or in the near future, afford that access to medical care which is medicaid's promise."); *Dental Society of State v. Carey,* 461 N.Y. S.2d 77, 79, 92 A.D.2d 263 (1983) (holding that providers' contention that the state's fee structure for dentists failed to enlist enough providers to conform with § 447.-204, stated a claim upon which relief could be granted).

The cases relied upon by plaintiffs, *Sutter Community Hospitals of Sacramento v. State Department of Health Services,* 705 F.2d 468 (9th Cir.1983), and *Wisconsin Hospital Association v. Reivitz,* Medicare and Medicaid Guide (CCH) ¶ 32,380 (E.D. Wis. Jan. 11, 1983), are inapposite. Both involved a successful challenge to hospital reimbursement rates, not on the ground of non-compliance with § 1396a(a)(30), but on the basis of non-comformance with § 1396a(a)(13)(A). This provision, which is applicable *only* to hospitals and long term care facilities, specifically requires that a state find and make satisfactory assurances to the Secretary of USDHHS that payments to these providers are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities[.]" 42 U.S.C. § 1396a(a)(13)(A). The regulations implementing this provision, moreover, specif-

ically require findings by the state Medicaid agency. *See* C.F.R. § 447.252(b) (1982).

 Plaintiffs did not establish that any medicaid recipient in California *in fact* has been denied the requisite "equal access" to laboratory services as a result of the 25% reimbursement rate reduction for laboratories. Consequently, plaintiffs' "efficiency, economy, and quality of care" challenge must fail.

## VI. REMAINING CONTENTIONS

 Plaintiffs contend that the payment rates resulting from the 25% reduction were neither enacted nor implemented in accordance with the applicable state plan procedures and therefore are invalid. This contention is without merit. The procedural requirements contained in Attachment 4.19–B to the State Plan apply only to administrative action.[30] Thus, in enacting AB 799, § 53, the Legislature was not bound by the State Plan's procedural requirements. Even if DHS, unlike the legislature, was obligated to follow the procedures specified in Attachment 4.19–B, its implementation of the 25% reduction is valid as well.[31] The federal HCFA received the proposed State Plan Amendment exempting legislatively required changes in reimbursement rates on August 2, 1982. Although HCFA did not approve this Amendment until August 20, 1982, prior approval is not necessary to the validity of the amendment.[32] The Amendment was therefore valid no later than August 2, 1982. Therefore, as of August 11, 1982, the date on which the reduction in reimbursement rates became effective, *see* Part III, *supra*, DHS's actions fully complied with the State Plan.[33]

 Plaintiffs also argue that DHS has implemented the reimbursement rate

**30.** Attachment 4.19–B sets out the methodology that must be utilized by the "*State Agency*" in establishing payment rates. This unequivocal language demonstrates that the Plan's requirements do not extend to legislative action. Moreover, the procedures established, such as a public hearing requirement, clearly are inappropriate in the context of legislative decisionmaking.

**31.** In light of the Court's holding that DHS complied with the State Plan, the Court need not reach the issue of whether the legislature's mandate in AB 799, § 53, relieved DHS of the obligation to comply with the requirements established in attachment 4.19–B.

**32.** Under the Medicaid statutes and regulations governing laboratory and pathology services performed by all but hospital inpatient providers, an amended State Plan is not subject to *any* approval requirement (i.e., either prior or subsequent). Instead, the Secretary is authorized to impose sanctions when the amended state plan is found to be out of compliance with the Act. *See* 42 U.S.C. § 1396c (1974); 45 C.F.R. 201.6(a) (1982). 45 C.F.R. § 205.5(b) (1982) (federal contributions to a state's Medicaid program may be increased by a plan amendment "as of the first day of the calendar quarter in which an approvable amendment *is submitted* or the date on which the amended provision becomes effective in the State, whichever is later") (emphasis added). *Cf. Charleston Memorial Hospital v. Conrad,* 693 F.2d 324, 332–33 (4th Cir.1982) (no prior approval requirement under 42 U.S.C. § 1396a(a)(13)); *Jennings v. Alexander,* 518 F.Supp. 877, 888 (M.D.Tenn.1981) (same).

*Washington State Health Facilities Association v. State of Washington Department of Social and Health Services,* 698 F.2d 964 (9th Cir.1982), cited by plaintiffs, is not on point. That case involved 42 U.S.C. § 1396a(a)(13)(E), which, unlike the statutory provisions involved in the instant action, contained, at the relevant time, an explicit approval requirement. Thus, the sole question presented was whether the amendment took effect immediately or only after the Secretary had approved it. Moreover, it is unclear whether the Ninth Circuit's prior approval requirement would apply in a case involving an amendment (that is not considered a submission of a new state plan) to a plan governed by 42 U.S.C. § 1396a(a)(13)(A), the successor to § 1396a(a)(13)(E). *See Charleston Memorial Hospital,* 693 F.2d at 332–33; *Jennings,* 518 F.Supp. at 888; *Magee-Womens Hospital v. Heckler,* 562 F.Supp. 483, 485–86 (W.D.Pa.1983).

**33.** The conclusion that the DHS complied with the State Plan is not altered even if the Medicaid statute and regulations are construed to require the Secretary's approval of the State Plan Amendment involved here. As described above, the HCFA approved the Amendment retroactively to July 1, 1982. While the Court need not address the question of whether the Amendment may take effect prior to its date of promulgation, such a retroactive application is surely proper as of the date the DHS submitted the amendment to the HCFA. *Cf.* 45 C.F.R. § 205.-5(b).

reduction mandated by AB 799, § 53(9), in an arbitrary and capricious fashion. Under California law, agency action is arbitrary and capricious only where the agency has failed either to consider adequately all relevant factors, or to demonstrate a rational connection between those factors, the choice made, and the purposes of the enabling legislation. *California Hotel and Motel Association v. Industrial Welfare Commission*, 25 Cal.3d 200, 212, 157 Cal. Rptr. 840, 847, 599 P.2d 31, 38 (1979). Applying these tests here, the Court is satisfied that the manner in which DHS implemented the 25% reimbursement rate reduction was not arbitrary or capricious.

For the reasons set forth above, judgment will be entered in favor of the defendants and against the plaintiffs.