42 F.3d 595
 46 Soc.Sec.Rep.Ser. 227, Medicare & Medicaid Guide
P 42,977
STATE of Oklahoma, Petitioner,
v.
Donna E. SHALALA, as Secretary of the Department of Health
and Human Services; Department of Health and Human
Services; Bruce C. Vladeck, as Administrator of the Health
Care Financing Administration; Department of Health and
Human Services Health Care Financing Administration, Respondents.
 No. 93-9572.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 6, 1994.
 
 Charles A. Miller, Covington & Burling, Washington, DC (Howard J. Pallotta, Asst. Gen. Counsel, Dept. of Human Services, Oklahoma City, OK, and Anna P. Engh, Covington & Burling, Washington, DC, with him on the briefs), for petitioner.
 Stuart I. Silverman, Office of Gen. Counsel, Dept. of Health and Human Services (Harriet S. Rabb, Gen. Counsel; Darrel J. Grinstead, Associate Gen. Counsel, Health Care Financing Admin., Henry R. Goldberg, Deputy Associate Gen. Counsel for Litigation, with him on the brief), Washington, DC, for respondents.
 Before ANDERSON and LOGAN, Circuit Judges, and SAFFELS,* District Judge.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 This case involves the applicability of public notice requirements to a state Medicaid plan amendment. Oklahoma petitions for review of a final decision of the Administrator of the Health Care Financing Administration ("HCFA"), an agency within the Department of Health and Human Services, affirming the agency's disapproval of the effective date of Oklahoma Medicaid state plan amendment 89-18. Petitioner State of Oklahoma argues that HCFA erroneously found (1) that an annual inflation increase in the State's Medicaid rates to hospitals was a change in methods and standards for setting payment rates to providers; (2) that the change was significant, thus triggering a requirement for prior public notice under 42 C.F.R. Secs. 447.205 and 447.253; and (3) that actual notice provided to hospital providers and the public nature of the rate-setting process did not obviate the need to satisfy the public notice requirement. We exercise jurisdiction over this petition for review under 42 U.S.C. Sec. 1316(a)(3) and affirm the Administrator's decision.
 
 BACKGROUND
 
 2
 Since 1983, Oklahoma has set its Medicaid reimbursement rates for hospitals prospectively, using historical costs adjusted for inflation.[1] From November 1983 through December 1985, the State used the HCFA market basket index to determine its inflation adjustment. In 1986, the State adopted a new approach by which the Oklahoma Commission for Human Services ("Commission") approved an inflation adjustment after considering various state and national indices. HCFA advised the State that if it intended to adjust rates
 
 
 3
 using a variety of criteria that cannot be precisely specified in advance, then we believe the plan should be amended to describe the general process and (1) periodically amended to reflect the actual adjustments recommended by the commission or (2) specify the HCFA market basket as an upper limit and address the reasonableness and adequacy of adjustments in the State's annual findings.
 
 
 4
 R. at 331.
 
 
 5
 Either way, HCFA said, such amendments would be a "significant change" in rate-setting methods and standards. Id. Significant changes require public notice before their effective date. See 42 C.F.R. Secs. 447.205, 447.253(f) (1989).[2]
 
 
 6
 For State Plan Amendment ("SPA") 86-1, which established a three percent inflation factor, and SPA 87-2, which set a zero percent inflation factor, the State published notice and provided assurances to HCFA of compliance with section 447.205. See R. at 305, 307, 311, 313, 316-17, 320-21, 366.
 
 
 7
 Effective July 1, 1987, however, the State claims that it changed approaches again. In its transmittal to HCFA of SPA 87-13, it said the Commission had determined its 3.7 percent proposed inflation adjustment "[b]ased upon a review of Oklahoma hospital cost report factors as reflected in the two most recently submitted cost reports." R. at 298. In its written assurances filed in conjunction with SPA 87-13, the State said it had "complied with the public notice requirements of 42 CFR 447.205," R. at 301, but it does not appear to have published a complying notice. See R. at 366.[3]
 
 
 8
 To set the FY 1989 inflation adjustment of four percent, the State filed another plan amendment, SPA 88-3, with the identical explanation quoted above. R. at 293, 298. HCFA approved Oklahoma's inflation adjustment without receiving any written assurances regarding public notice. See R. at 292-95. The agency later asserted that the approval had been inadvertent. Respondents' Br. at 6, n. 6.
 
 
 9
 The same methodology used in SPA 87-13 and SPA 88-3 was again referenced in SPA 89-18, the plan amendment at issue in this case, which set a FY 1990 inflation rate of 5.9 percent. See R. at 280. Oklahoma submitted SPA 89-18 to HCFA on December 7, 1989, with a proposed retroactive effective date of July 1, 1989. R. at 279. In a December 21, 1989, letter, the State Director of Human Services assured HCFA that the department had complied with public notice requirements of 42 C.F.R. Sec. 447.205, R. at 282, but the State at that time had not published a complying notice. See R. at 366. The State completed publication of notice on June 24, 1990. On July 27, 1990, HCFA's Administrator approved the inflation adjustment but disapproved the July 1, 1989, effective date because, among other things, SPA 89-18 was a significant change in methods and standards, requiring prior public notice. See R. at 286-88.
 
 
 10
 On September 24, 1990, the State requested reconsideration of the partial disapproval. On March 31, 1992, HCFA notified the State it was disallowing $5,601,512 in federal funds based on the disapproval. An appeal of that disallowance is stayed pending the outcome of this appeal. On January 15, 1993, a hearing officer recommended affirmance of the disapproval of the effective date. The State submitted exceptions. The Administrator affirmed on July 28, 1993. R. at 1-10.
 
 STANDARDS OF REVIEW
 
 11
 We review the disapproval of a state Medicaid plan under Administrative Procedure Act standards and affirm unless we find the agency's action to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. Sec. 706(2)(A); New Mexico Dept. of Human Servs. v. Health & Human Servs. Health Care Fin. Admin., 4 F.3d 882, 884 (10th Cir.1993). To make this finding we consider whether the Administrator based his decision on a consideration of the relevant factors and whether he made a clear error of judgment. Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983) (citations omitted). We may not supply a reasoned basis for the Administrator's action that the Administrator himself has not given, but we will uphold a decision of less than ideal clarity if the Administrator's path may reasonably be discerned. Id.
 
 
 12
 The Administrator's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. Sec. 1316(a)(4); see also 5 U.S.C. Sec. 706(2)(E). The HCFA's interpretation of its own regulations is of controlling weight unless plainly erroneous or inconsistent with the regulation. Valley Camp of Utah, Inc. v. Babbitt, 24 F.3d 1263, 1267 (10th Cir.1994); City of Aurora v. Hunt, 749 F.2d 1457, 1461-62 (10th Cir.1984).
 
 DISCUSSION
 
 13
 I. Change in Rate-Setting Methods and Standards.
 
 
 14
 Oklahoma argues that it set its inflation factor in the same way for three years in a row, and therefore SPA 89-18 made no change in methods and standards. See Petitioner's Br. at 5, 6, 16; Petitioner's Reply Br. at 8. But the Administrator found that the inflation adjustment described in SPA 89-18 was a change in amount, the methodology for which was not described in either SPA 89-18 or the state plan. R. at 6. Therefore, he said, the new inflation factor altered the equation used to calculate payment rates and constituted a change in the methods or standards for setting rates. Id.
 
 
 15
 The Administrator relied on Missouri Dept. of Social Servs. v. Sullivan, 957 F.2d 542, 544 (8th Cir.1992): When an unexplained inflation adjustment operates as a sort of "black box," HCFA may reasonably view the new adjustment "as an alteration of [the state's] methodology, not as new data plugged into an unchanged equation." Missouri Dept., 957 F.2d at 544. Oklahoma does not quarrel with this principle, but rather attempts to distinguish its circumstances from those in Missouri Dept. The State argues that the 5.9 percent inflation adjustment in SPA 89-18 is not an unexplained number, because the methodology underlying it had previously been described in SPA 88-3. The description to which the State points in SPA 88-3 is identical to that contained in SPA 87-13 and SPA 89-18. It states briefly that the inflation adjustment was "[b]ased upon a review of Oklahoma cost report factors as reflected in the two most recently submitted cost reports."[4] We must review, then, the Administrator's implicit finding that this language did not constitute a description of methods or standards.
 
 
 16
 The applicable statute, 42 U.S.C. Sec. 1396a(a)(13)(A), refers to "methods" and "standards" for determining reimbursement rates, but neither the statute nor HCFA regulations define the two terms. HCFA has required by rule, though, that a state plan "specify comprehensively the methods and standards used by the agency to set payment rates in a manner consistent with Sec. 430.10 of this chapter." 42 C.F.R. Sec. 447.252(b) (1993). A plan must be "comprehensive" and contain "all information necessary for HCFA to determine whether the plan can be approved to serve as a basis for Federal financial participation (FFP) in the State program." 42 C.F.R. Sec. 430.10 (1993).
 
 
 17
 In making the finding that no methodology was set forth in SPA 89-18 or the state plan, the Administrator implicitly interpreted the regulations as requiring that a comprehensive description contain something more than the single sentence in question, which does not specify what cost report factors were used, how they were used, or whether they were the only factors considered. This interpretation is not plainly erroneous. "The plain meaning of the term 'specify comprehensively' implies both some degree of detail and some sense of thoroughness or completeness in the description of the methods and standards used to set the rates." Oklahoma Nursing Home Ass'n v. Demps, 816 F.Supp. 688, 698 (W.D.Okla.1992), appeal dismissed, 9 F.3d 117 (1993), vacated by district court order March 3, 1994.[5]
 
 
 18
 Substantial evidence supports the finding that neither SPA 89-18 nor the state plan contained any legally sufficient description of the methods and standards used to derive the 5.9 percent inflation factor. The State's own post hoc description of its methodology, submitted during the administrative appeal, demonstrates the incompleteness of the one-sentence description included in the various plan amendment transmittals. The later, more comprehensive description shows that the cost report numbers were not the only data considered in the rate-setting process; the Division of Medical Services also considered unspecified other economic indices. See R. at 85, 91. HCFA had previously made clear to the State that if it relied on indices to set its adjustment, those indices must be identified and their use explained, or the resulting number would be considered a change in methods and standards. See R. at 215, 331. In addition, it appears that deriving the median of the percentage changes in five cost factor categories from the hospital cost reports was only the beginning, not the end, of a discretionary decision-making process that culminated in the Commission's final selection of a number. See R. at 85-87, 91-93. By almost any definition of methods and standards, the single-sentence description of the methodology included in SPA 87-13, SPA 88-3 and SPA 89-18, is not a comprehensive description of what Oklahoma was doing.[6] The Administrator reasonably determined that the 5.9 percent figure was an inadequately explained number that should be treated as a change in the State's methods and standards for setting reimbursement rates.
 
 
 19
 II. Significant Change in Rate-Setting Methods and Standards.
 
 
 20
 Oklahoma argues first that HCFA arbitrarily failed to follow its stated policy of deferring to a state's reasonable determination of the significance of a change in methods and standards. Petitioner's Br. at 21-23.[7] Oklahoma maintains that instead of finding that the State's determination of insignificance was unreasonable, the Administrator merely found that HCFA's own determination of significance was reasonable. The State argues that this error prejudices it, because the State's determination of insignificance clearly was reasonable. It cites the fact that the State had made an inflation adjustment to hospital rates every year since 1983, that the providers expected the adjustment, that the adjustment was "in the same range" as previous adjustments, and that the State had not issued public notice for the adjustment in the previous year and HCFA approved it anyway. Petitioner's Reply Br. at 7, 13.
 
 
 21
 HCFA does not appear to dispute that a state is to make the initial determination of significance: "We submit that ultimately, HCFA must judge the reasonableness of a state's characterizations of amendments to its plan, and HCFA's determination should be sustained if it is neither arbitrary nor capricious." Respondents' Br. at 26.[8]
 
 
 22
 It is possible to read the Administrator's decision, as Oklahoma did, as a finding with regard to HCFA's determination, rather than with regard to the State's. See R. at 8 ("[T]he Administrator finds that the Hearing Officer properly decided that HCFA reasonably determined that the proposed amendment constitutes a significant change in the methods or standards used to set Medicaid payments.").
 
 
 23
 We must determine, then, whether the Administrator merely wrote unclearly or actually applied a standard different from the one he purports to recognize. Upon examination we find that, whether or not he was bound to do so, the Administrator did implicitly review the reasonableness of the State's determination; he found it to be unreasonable and therefore gave it no deference. The Administrator found that the 5.9 percent inflation adjustment "represents a substantial increase in the inflation adjustment over prior years," R. at 8, implicitly rejecting as unreasonable the State's argument that the adjustment was "in the same range" as previous ones. The inflation factor in SPA 86-1 was 3 percent; SPA 87-2, zero percent; SPA 87-13, 3.7 percent; SPA 88-3, 4 percent; SPA 89-18, 5.9 percent. The Administrator could reasonably find that an inflation adjustment nearly half again as large in percentage terms as the next highest adjustment in the previous four amendments was a substantial increase in that factor.
 
 
 24
 The Administrator also found that the State was advised as early as 1986 that HCFA would consider the proposed annual inflation changes significant as long as the State used various measures of inflation without formally committing itself to the use of any one or any combination of indices.[9] This finding implicitly rejects as unreasonable any reliance on the fact of annual inflation adjustments since 1983 or on providers' expectations as a basis for calling this particular adjustment insignificant. We further note that SPA 86-1 and SPA 87-2 also were annual adjustments, and there was no showing that they were less anticipated than SPA 89-18, yet Oklahoma does not dispute their significance. The Administrator was correct to deem these two premises an unreasonable basis for the State's determination that SPA 89-18 was insignificant.
 
 
 25
 Finally, the State argues that because it did not issue public notice of SPA 88-3 the previous year and HCFA approved the amendment anyway, the State acted reasonably in concluding that SPA 89-18 must not be a significant change in methods and standards. See Petitioner's Reply Br. at 7, 13. It does not appear that Oklahoma raised this argument before the Administrator, though, see R. at 68-70, so we do not consider it here. Rives v. ICC, 934 F.2d 1171, 1176 (10th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1559, 118 L.Ed.2d 207 (1992).
 
 
 26
 Implicitly finding Oklahoma's determination of insignificance to be unreasonable and entitled to no deference, the Administrator made his own finding that SPA 89-18 was a significant change in rate-setting methods and standards. HCFA's regulations do not define "significant proposed change," and the agency has pointedly refused invitations to add a definition to the regulations. See preamble to Final Rule, 48 Fed.Reg. 56,046, 56,049-50. But the agency has instructed states that in determining the significance of a change in methods and standards, they should "consider the impact of the proposed change (e.g., the change in rates and the number of providers affected)."[10] Id. at 56,051. Here, the Administrator looked at both the magnitude and the breadth of impact of SPA 89-18. He found that the 5.9 percent inflation adjustment to Medicaid payment rates for inpatient hospital services "was the largest single determinant of all inpatient hospitals' year-to-year payment increase." R. at 7. "The amendment represents a substantial increase in the inflation adjustment over prior years and will impact payment for all inpatient hospital services in the State of Oklahoma." R. at 8.
 
 
 27
 Oklahoma suggests that the mere fact that an inflation factor determined the hospitals' annual payment increase says nothing about the factor's significance if the resultant annual payment increase itself was miniscule, and here the Administrator made no finding that the payment increase was significant. See Petitioner's Br. at 24. This logic might persuade us, had the State not already effectively conceded that the 5.9 percent increase was significant in magnitude. See id. at 10 (disapproval of July 1, 1989, effective date is of "great significance to Oklahoma"--$5.6 million of scarce state funds and services valued at over $18 million are at stake). We find that substantial evidence supports the Administrator's finding that SPA 89-18's 5.9 percent inflation factor was a significant change in rate-setting methods and standards.[11]
 
 
 28
 III. Notice Requirement.
 
 
 29
 The State does not contend that it complied fully with the formal public notice requirements of 42 C.F.R. Sec. 447.205 before June 24, 1990. It argues instead that its "lack of exact compliance" is excused "because the rate increase was established through a public process in which the State issued actual notice of the increase to the affected providers." Petitioner's Br. at 26.
 
 
 30
 The Administrator disagreed that either a public ratemaking process or actual notice could substitute for "at least minimal compliance" with section 447.205. He said that even if all affected parties had actual notice, the State must publish "an appropriate public notice before the effective date of the proposed change."[12]
 
 
 31
 In promulgating the public notice requirements, HCFA specifically decided that a federal rule was necessary, despite the existence of administrative procedures acts in most states that already provided for notice of the type of ratemaking process involved here. See preamble to Interim Final Rule, 46 Fed.Reg. 47,964, 47,966-67 (Sept. 30, 1981) (modifying section 447.254 notice requirements); preamble to Interim Final Rule, 46 Fed.Reg. 58,677, 58,679 (Dec. 3, 1981) (revising section 447.205); preamble to Final Rule, 48 Fed.Reg. 56,046, 56,050 (Dec. 19, 1983) (merging section 447.254 into section 447.205). We cannot say, therefore, that the Administrator erred in construing section 447.205 as adding a separate requirement over and above whatever a particular state's public processes might already provide, as a procedural protection for providers and beneficiaries and "a reasonable method for ensuring that rate changes are equitable and conform to statutory mandates." R. at 9 (citing North Carolina Dept. of Human Resources v. United States Dept. of Health and Human Servs., 999 F.2d 767, 771 (4th Cir.1993)).
 
 
 32
 The Administrator's decision clearly contemplates that actual notice does make a difference, potentially relaxing the notice requirement from full formal compliance to "at least minimal compliance" through publication of "an appropriate public notice before the effective date of the proposed change." R. at 9; see also State of Illinois v. Shalala, 4 F.3d 514, 517 (7th Cir.1993) (where affected parties had actual notice of a legislatively mandated plan amendment, "at least minimal compliance with section 447.205(d)'s requirement of publication before the proposed effective date" was still required). Cf. North Carolina Dept., 999 F.2d at 771 (finding nothing in federal regulations that permits harmless error exception to section 447.205 notice requirements).
 
 
 33
 Were we to read the Administrator's decision as saying that less than total compliance with every requirement of section 447.205(c) and (d) would always be a violation, no matter what actual notice had been given, we might find his interpretation to be plainly erroneous. A strong argument could be made that such rigidity would conflict irreconcilably with the clear legislative and rulemaking intent that the states be given flexibility in determining rates and that federal reporting and other administrative requirements be kept to the minimum necessary to assure proper accountability. See, e.g., 48 Fed.Reg. 56,046, 56,046-47 (discussing legislative history of Omnibus Reconciliation Act of 1980, Pub.L. 96-499, Sec. 962, and Omnibus Budget Reconciliation Act of 1981, Pub.L. 97-35, Sec. 2173). We do not understand the Administrator to be going that far. We do not find his interpretation to be erroneously rigid, even though by always requiring some advance publication it is arguably less flexible than a traditional actual notice/harmless error exception.[13]
 
 
 34
 Substantial evidence supports the Administrator's inherent finding that in this case, the State did not comply even minimally with either the content or the publication requirements of section 447.205.[14] Publication was not made in the state register, nor were legal notices placed in newspapers of appropriate circulation. The notice of the May 15, 1989, public hearing of the Committee on Rates and Standards to review and set hospital payment rates did not mention the inflation adjustment at all, did not include any dollar or percentage numbers, and did not refer to methods and standards or reasons for the change. See R. at 106-08. We can find no copy in the record of the notice of the June 26, 1989, public meeting at which the Commission adopted the adjustment, so we cannot evaluate its content. See R. at 87. Of the two June 27, 1989, news articles cited by the State that mentioned the rate increase, one listed the inflation adjustment as 5.7 percent, the other did not give any number, and both mentioned the increase in a single paragraph low in the story without any discussion of methods and standards or of locations where copies of the proposed changes could be obtained and where comments could be sent. R. at 120, 122. It borders on the ridiculous for Mr. Brodt to have stated in his affidavit for the State that "the amount of the rate adjustment was published" in these two articles. See R. at 87-88. Moreover, the issue brief, R. at 103-04, that was made available to those attending the May 15, 1989, public hearing, and the June 26, 1989, Commission public meeting, see R. at 86, is irrelevant if notice of the gatherings themselves was inadequate to attract public attendance.
 
 
 35
 IV. Administrator's Disapproval of Proposed Effective Date.
 
 
 36
 We find that the Administrator, in deciding to disapprove the proposed July 1, 1989, effective date for SPA 89-18, considered the relevant factors and reasonably found that the amendment was a significant change in methods or standards for setting reimbursement rates, that publication requirements were not met until June 24, 1990, that no actual notice exception applied, and that therefore the amendment could not take effect before June 25, 1990. The State argues that enforcing the law as written would be a clear error in judgment, essentially because the cost to the State would be high. The cost could have been much lower, however, had the State not chosen to wait five months after the proposed effective date even to file the amendment with HCFA. The State surely knows how long it takes to get an amendment approved and the risk it takes by waiting so long.
 
 
 37
 Discerning no clear error in judgment on the Administrator's part, we find that his decision was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. The Administrator's decision is therefore AFFIRMED.
 
 
 
 *
 The Honorable Dale E. Saffels, Senior Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 Medicaid is a cooperative federal-state program to cover certain costs of medical treatment, including hospital care, for the poor. For a general description of the Medicaid program, under 42 U.S.C. Secs. 1396-1396(v), see Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Social and Rehabilitation Servs., 31 F.3d 1536, 1538-40 (10th Cir.1994). In Oklahoma, the federal government covers 70.39 percent of the State's payments to eligible individuals. See Petitioner's Br. at 3 (citing State Medicaid Manual Sec. 2501)
 
 
 [2]
 Section 447.253(f) was recodified without change in 1992 as 447.253(h). See 57 Fed.Reg. 43,921 (Sept. 23, 1992)
 
 
 [3]
 The State maintains that it is proper for a state to file assurances of compliance without publishing notice where the state has determined that notice is not required. See Petitioner's Reply Br. at 7, n. 1
 
 
 [4]
 A more complete description of the methodology was given in an assurances letter apparently sent in conjunction with the transmittal of SPA 87-13:
 The rate adjustment is based on a comprehensive and detailed review of all Oklahoma hospital cost reports for the two most recent cost reporting years of State FY 85 and FY 86. The review focused upon percentage increases from FY 85 to FY 86 in terms of actual increase of operating expenditures, occupancy changes, average length of stay changes, proportion of patient days to full-time employees and changes in patient days. This analysis resulted in a range of percentage changes. The median point of that range was 3.7%. Through a public hearing and later approved by the Commission for Human Services, it was determined that this rate of increase (3.7%) carried forward to the FY 88 rate year would be reasonable and adequate reimbursement.
 R. at 299.
 Neither party, however, cites to this language as being incorporated into the state plan by amendment, so we do not consider whether it might have sufficed as a comprehensive description of the methodology.
 
 
 [5]
 Although the district court vacated this December 9, 1992, order, together with a September 28, 1993, order, upon settlement of the case, we find the court's reasoning on this point persuasive
 
 
 [6]
 We also note a serious contradiction in Oklahoma's own representations as to whether it changed methods and standards with SPA 87-13 and then followed the same fixed equation thereafter. The State argues now that "[t]he methodology was changed in 1987" to adopt the five-factor analysis for the FY 1988 rate-setting. See Petitioner's Br. at 4-5. In answers to HCFA requests for admissions during the administrative proceedings, however, Oklahoma stated that SPA 87-13 "was not a change in the methods and standards of the State plan." R. at 339. This earlier statement is incomprehensible to us. Either the state did change from its open-ended review of State and national inflation indices used in SPA 87-2 and SPA 86-1, R. at 305, 311, to a more constrained approach, in which case SPA 87-13 was a change in methods or standards for that reason, or it continued to use the same open-ended approach in SPA 87-13 as it had in SPA 87-2 and SPA 86-1, which Oklahoma has acknowledged would itself constitute an annual change in methods or standards
 
 
 [7]
 As evidence of this policy, the State cites Regional Medicaid Manual Sec. 6302 ("A State's determination of the significance or insignificance of plan changes must be based on a test of reasonableness."), R. at 370; a November 5, 1991, document sent by HCFA Regional Administrator George R. Holland to state agencies in eight states explaining the public notice requirements under 42 C.F.R. Sec. 447.205 ("It has been HCFA policy that each State may determine what it considers to be significant. However, the State's determination that an amendment is not significant is subject to review by HCFA."), R. at 162; and California Dept. of Health Servs., Departmental Appeals Board Decision No. 1352 at 10 (1992) (Addendum B to Petitioner's Br.) (remanding case to HCFA to consider whether state could reasonably have viewed its plan amendment as not being a significant change)
 
 
 [8]
 The Administrator himself cited the preamble to final regulations published December 19, 1983, stating that where a state submits a plan amendment that it terms insignificant but which others may believe is significant, "we expect that a State's determination of significant or insignificant changes to its payment methods and standards is based on a test of reasonableness." R. at 7 (citing 48 Fed.Reg. 56,046, 56,052 (emphasis added)). See also id. at 8 (citing Section 6002 of the State Medicaid Manual: a "State's determination of the significance or insignificance of plan changes must be based on a test of reasonableness")
 
 
 [9]
 A May 12, 1986, letter from HCFA to the State, R. 215, gives the state an additional option, referring to the State's committing itself to "a given index, combination of indices, or a specific methodology for future periods." (Emphasis added.) The State asserts that it committed itself to a specific methodology in SPA 87-13, SPA 88-3 and SPA 89-18, but, as discussed above, the State's language amounted to far less than a comprehensive description of any methodology
 
 
 [10]
 The State argued below that under HCFA's own stated policy, the significance of state plan changes is to be assessed not by the change in payment amounts or number of facilities affected, but solely by the degree to which payment methods and standards have changed. See Supp.R. Vol. I at 22. The State does not pursue this argument on appeal, so we do not address it
 On appeal, the State cites California Dept., supra n. 7, at 10 (Addendum to Petitioner's Br.), for the proposition that significance is to be determined by whether an amendment significantly changes the direction of the state's Medicaid program or its methodology. We do not dispute the importance of these considerations. We note, however, that the Board in California Dept. also considered the State's finding on the quantitative magnitude of the change at issue, which affected less than .007 of 1 percent of an annual $6 billion program. See id.
 
 
 [11]
 Although the State's concession of this point allows us to avoid the costly exercise of a remand for further factual findings, we can easily foresee future cases where we will not be able to sustain the Administrator's decisions without more carefully articulated findings than he has chosen to provide here
 
 
 [12]
 Here, the State has not claimed more than partial actual notice--to hospital providers. The rulemaking history of the public notice requirements manifests a concern that the public and patients, as well as providers, be apprised of significant changes in methods and standards. See Morabito v. Blum, 528 F.Supp. 252, 270 (S.D.N.Y.1981); preamble to Interim Final Rule, 46 Fed.Reg. 47,964, 47,966-67 (Sept. 30, 1981) (modifying section 447.254 notice requirements); preamble to Interim Final Rule, 46 Fed.Reg. 58,677, 58,679 (Dec. 3, 1981) (revising section 447.205). What the public and patients received with respect to SPA 89-18 appears to have been, at best, constructive notice of their opportunity to participate in a public rate-setting process in which they could have obtained actual notice of the change in the inflation adjustment
 The clear deficiency in actual notice itself would dispose of this issue, had the Administrator made a finding with respect to it. He did not, and we may not supply a reasoned basis for his decision that he himself did not give. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, 103 S.Ct. at 2866-67 (citing SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)).
 
 
 [13]
 Even a case heavily relied upon by the State as support for an actual notice exception, California Ass'n of Bioanalysts v. Rank, 577 F.Supp. 1342, 1349-51 (C.D.Cal.1983), holds only that where a state provides inadequate formal notice--as opposed to no notice at all--an aggrieved party with actual notice essentially lacks standing to complain of technical defects. See id. at 1350, n. 10. The court in Rank does not disagree that notice must be given in advance of the effective date. See id. at 1350-51
 Another case relied on by the State, Himes v. Sullivan, 779 F.Supp. 258, 270-71 (W.D.N.Y.1991), aff'd without published opinion, 956 F.2d. 1159 (2d Cir.1992), also is, at bottom, just a holding that plaintiffs with actual notice lack standing to complain of formal notice defects, because they were not prejudiced by them. See id.
 
 
 [14]
 (c) Content of notice. The notice must--
 (1) Describe the proposed change in methods and standards;
 (2) Give an estimate of any expected increase or decrease in annual aggregate expenditures;
 (3) Explain why the agency is changing its methods and standards;
 (4) Identify a local agency in each county (such as the social services agency or health department) where copies of the proposed changes are available for public review;
 (5) Give an address where written comments may be sent and reviewed by the public; and
 (6) If there are public hearings, give the location, date and time for hearings or tell how this information may be obtained.
 (d) Publication of notice. The notice must--
 (1) Be published before the proposed effective date of the change; and
 (2) Appear as a public announcement in one of the following publications:
 (i) A State register similar to the Federal Register.
 (ii) The newspaper of widest circulation in each city with a population of 50,000 or more.
 (iii) The newspaper of widest circulation in the State, if there is no city with a population of 50,000 or more.
 
 
 [42]
 C.F.R. Sec. 447.205(c) and (d)