**STORMONT–VAIL REGIONAL HEALTH CENTER, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of the Department of Health and Human Services, Defendant.**

No. 95–4168–SAC.

United States District Court, D. Kansas.

Oct. 16, 1996.

Charles R. Hay, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for plaintiff.

Melanie D. Caro, Office of United States Attorney, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The plaintiff brings this action under the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.*, seeking judicial review of final decisions by the Department Health and Human Services Provider Reimbursement Review Board ("PRRB") and the Administrator of Health Care Financing Administration ("Administrator"). The decisions being appealed adjust Medicare reimbursements for interest expense. The plaintiff Stormont–Vail Regional Health Center ("Stormont–Vail") contends the defendant erred in reducing reimbursements for Stormont–Vail's claimed interest expense by the investment income earned in 1986 and 1987 from what Stormont–Vail alleges was its funded depre-

ciation accounts. The Secretary moves for summary judgment arguing the adjustments were required by law. (Dk. 7).[1] The plaintiff responds in opposition asking the court to deny the defendant's motion and to overturn her decision. (Dks. 10 and 11). The court considers the case to have been fully briefed as contemplated by D.Kan. Rule 83.7.

## STATUTORY AND REGULATORY BACKGROUND

### Overview of Program

The Medicare Act, 42 U.S.C. § 1395, *et seq.*, funds medical care of the aged and the disabled. Stormont–Vail, as a qualified "provider of services" under the Medicare Act, is entitled to reimbursement for the "reasonable cost" of hospital services furnished to Medicare beneficiaries. The term, "reasonable cost," is defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included...." 42 U.S.C. § 1395x(v).

Providers ordinarily receive their Medicare reimbursements through private organizations, typically insurance companies, who contract with the Secretary and are known as fiscal intermediaries. 42 U.S.C. § 1395h. Under this system, the intermediary makes interim payments approximating the provider's actual costs. 42 C.F.R. § 413.64. At the end of a cost reporting year, the provider files an annual cost report. 42 C.F.R. § 413.20. The intermediary then audits the annual cost report, determines the total amount of reimbursements due, and adjusts retroactively the payments based on the difference between the interim payments and the reimbursements due. 42 C.F.R. §§ 405.1803 and 413.64.

The intermediary issues a notice to the provider that sets forth the amount of the reimbursement, explains the intermediary's determination, and informs the provider of its right to a hearing and appeal. If the provider is dissatisfied with the intermediary's determination, the provider has 180 days to request a hearing before the Provider Reimbursement Review Board ("Board"). Sixty days after the Board's decision, the Secretary acting through the Administrator of the Health Care Financing Administration ("HCFA") may affirm, reverse, or modify the decision. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875. Providers may seek judicial review of the decision of the Board or the Administrator pursuant to the applicable provisions of the APA. 42 U.S.C. § 1395oo(f)(1).

### Applicable Medicare Payment Law

Pursuant to her authority under 42 U.S.C. § 1395x(v)(1)(A), the Secretary has adopted regulations providing that "[n]ecessary and proper interest on ... capital indebtedness is an allowable cost," 42 C.F.R. § 413.153(a)(1). Thus, such interest expense is reimbursable to the extent it was "necessary and proper." To be "necessary," the interest expense must meet the three-part test set out in 42 C.F.R. § 413.153(b)(2) (1986):

(i) Incurred on a loan made to satisfy a financial need of the provider. Loans that result in excess funds or investments would not be considered necessary;

(ii) Incurred on a loan made for a purpose reasonably related to patient care; and

(iii) Reduced by investment income except if such income is from gifts and grants, whether restricted or unrestricted, and that are held separate and not commingled with other funds. Income from funded

---

**1.** The defendant appears to have followed former D.Kan. Rule 503 which provides for the filing of "an appropriate dispositive motion and memorandum" for a social security appeal. The Tenth Circuit in *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1579 n. 29 (10th Cir.1994), disapproved this rule and, specifically, the motion practice under it. Since the filing of the plaintiff's motion, the United States District Court for the District of Kansas has amended its local rules effective October 1, 1995. Under the new local governing Social Security appeals, D.Kan. Rule 83.7, the parties are required to file only briefs in compliance with D.Kan. Rule 7.6. For purposes of the present appeal, the court attaches no legal significance to the dispositive motion that accompanies the plaintiff's memorandum. The court intends to follow the well-established standard of review for social security appeals and to rely only on what evidence is found within the administrative record.

depreciation or a provider's qualified pension fund is not used to reduce interest expense.

The last of these three elements is the only one at issue here.

The Secretary encourages providers to conserve funds for the replacement of depreciable assets. 42 C.F.R. § 413.134(e). "As an incentive for funding, investment income on funded depreciation will not be treated as a reduction of allowable interest expense." *Id.* Besides this regulation, the Secretary has issued program instructions on these accounts and collected them in the Provider Reimbursement Manual ("PRM"). The PRM at § 226.4 defines depreciation funding as "the practice of placing funds, including nonborrowed reserves and sinking funds, in a segregated account(s) for the acquisition of depreciable assets used in rendering patient care or for other capital purposes related to patient care." Such funds "must be placed in readily marketable investments of the type that assures the availability and conservation of the funds." PRM § 226. The following are other requirements for funded depreciation accounts ("FDA") taken from PRM § 226:

A. Approval.—The action to fund depreciation must be approved by the appropriate managing body of the provider, ..., in accordance with the needs and objectives of management.

B. Provider's Records.—The fund or funds must be clearly designated in the provider's records as funded depreciation accounts.

C. Restrictions.—Funded depreciation must be available ... on an as needed basis for the acquisition of the provider's depreciable assets used to render patient care, or for other capital purposes related to patient care.

....

D. Investment or Transfer.—When a provider invests or transfers the assets of the fund to a home office ... or to other related parties, these assets shall be treated as the provider's fund and are subject to all the provisions of § 226ff.

In short, to be regarded as an FDA, the fund: (1) must be placed in a readily market-able investment; (2) must be approved by the appropriate body of the provider; (3) must be clearly designated in the provider's records as an FDA; and (4) must be available on an as needed basis to acquire the provider's depreciable assets used for patient care or other capital purposes related to patient care.

One other regulation is noteworthy for this case. "[C]osts applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization." 42 C.F.R. § 413.17. Thus, in determining interest expense, the intermediary looks to those expenses and investment income from related organizations.

## STANDARD OF REVIEW

The standards under the Administrative Procedures Act require a court to affirm an agency's action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court must evaluate "whether the Administrator based his decision on a consideration of the relevant factors and whether he made a clear error of judgment." *State v. Shalala,* 42 F.3d 595, 598 (10th Cir.1994) (citation omitted). Though it may not supply a rationale for action when the Administrator has not given one, the court "will uphold a decision of less than ideal clarity if the Administrator's path may reasonably be discerned." *Id.*

■ "The Administrator's findings of fact are conclusive if supported by substantial evidence." *Id.* Substantial evidence is more than a scintilla and is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401–02, 91 S.Ct. 1420, 1427–28, 28 L.Ed.2d 842 (1971). The agency's "interpretation of its own regulations is of controlling weight unless plainly erroneous or inconsistent with the regulation." *State v. Shalala,* 42 F.3d at 598. Courts typically accord great deference to an agency's interpretation of its own regulations when they are meant to administer a complex statutory

**1530**

scheme like the Medicare Act. *Lexington County Hosp. v. Schweiker*, 740 F.2d 287, 289 (4th Cir.1984). The guidelines in the PRM "are the agency's interpretation of its own regulations, they 'should be accepted by the courts unless ... shown to be unreasonable or inconsistent with statutory authority.'" *Id.* at 288 (quoting *Fairfax Nursing Center Inc. v. Califano*, 590 F.2d 1297, 1301 (4th Cir.1979)).

### RELEVANT FACTS

1. Stormont–Vail is an urban, short term and acute care general hospital in Topeka, Kansas, that had 370 and 401 certified beds for fiscal years 1986 and 1987, respectively.

2. In 1982, Stormont–Vail restructured itself and formed a parent corporation, Stormont–Vail Health Services Corporation ("SVHSC"), that owned, operated, and controlled Stormont–Vail and later other affiliated health organizations.

3. Stormont–Vail's balance sheet for September 30, 1985, list among its "Board-designated funds" a fund for "Plant and equipment—cash and certificates of deposit" totalling $9,821.017. This was Stormont–Vail's funded depreciation account. Prior to March of 1986, Stormont–Vail's FDA consisted of deposits originally from general operating funds and was maintained in several certificates of deposit and other accounts at different financial institutions.

4. On March 31, 1986, Stormont–Vail's board approved the transfer of $11,000,000 to its parent SVHSC. These funds consisted of approximately $8,800,000 from Stormont–Vail's FDA, $2,100,000 from donated assets, and $90,000 from general funds. The written "Transfer of Funds"[2] provides in relevant part that upon Stormont–Vail's delivery of the funds consisting of the FDA then the funds would "become and remain the sole exclusive property of Transferee [SVHSC] to be used and applied as directed by or in accordance with the policies adopted by the Board of Directors of Transferee, limited

only by the provisions of the Articles of Incorporation and Bylaws of Transferee."

5. At the time of the transfer, SVHSC did not maintain a general ledger and primarily relied on a checking account to track its income and expenses. SVHSC's cash receipts and disbursements report for the period ending April of 1986 showed the funds transferred from Stormont–Vail as "contribution to capital." SVHSC's income statement for the same period reports these same funds as "General Fund Cash" and "General Fund Certificates of Deposit." Similarly, SVHSC's balance sheet for the same included the transferred funds in the category of General Fund Balance.

6. Beginning in October of 1986, SVHSC began and operated a general ledger which placed all certificates of deposit, including Stormont–Vail's funds transferred from its FDA, in a specifically designated investment account. This account was separate from the checking account and other investments.

7. Prior to August of 1989, SVHSC's books or statements did not reflect that it was holding an FDA. On August 30, 1989, SVHSC's board adopted a resolution that "reaffirmed the practice of placing funds received from Stormont–Vail Regional Medical Center in board-designated accounts for the purpose of acquiring depreciable assets and other capital items."

8. In the fiscal year of 1987, approximately $1,800,000 was spent from the certificates of deposit to acquire property across from Stormont–Vail and to improve the same property for use as a parking lot. Two additional tracts of land were acquired in the Stormont–Vail's vicinity at a cost of $37,000.

9. In the fiscal year of 1988, another $123,965 was used to improve the land purchased for a parking lot. This parking lot has been used almost exclusively by Stormont–Vail's personnel.

10. For the fiscal year of 1989, approximately $740,000 was spent to acquire and improve the Medical Arts Building West. It

---

**2.** Of the $8,800,000 FDA funds, approximately $8,000,000 was the subject of this written transfer document. The transfer of the remaining $800,000 was documented by an "Assignment of Certificates of Deposit." This assignment similarly provides that SVHSC as the assignee may use the funds as directed by its policies and board. (Tr. 277).

is used as office space for some hospital employees and for a retail pharmacy.

11. Blue Cross and Blue Shield of Kansas, Inc., the assigned fiscal Intermediary ("Intermediary") audited Stormont–Vail's cost reports and issued notices of program reimbursement finding that the certificates of deposit held by SVHSC from the date of their transfer in March of 1986 and until the resolution passed in August of 1989 did not constitute an FDA. The Intermediary's conclusion was based on the following determinations: that the Stormont–Vail transferred the funds to a related party, that SVHSC failed to identify the funds as an FDA until August of 1989, that as a result the funds were general funds of Stormont–Vail, and that the income from these funds must be offset against the allowable interest expense of Stormont–Vail.

12. Stormont–Vail requested hearings before the PRRB. After reviewing the facts, contentions and evidence, the PRRB affirmed, finding in relevant part:

> (1) the board of trustees effectively undesignated the FDA because the resolutions adopted and the transfer documents did not provide for the continuation of the funds as FDA and gave the parent's [SVHSC's] board of directors complete discretion as to the use of the funds; (2) the board of trustees initially placed restrictions upon the EF [endowment fund] when transferred and it could have made some designation regarding the use of the FDA in whole or in part but failed to do so; (3) the purpose of the transfer was for the capitalization of the parent and to facilitate the parent's ability to promote the objectives and purposes of the reorganization; namely, the purchase of certain subsidiaries, etc. which did take place; (4) the funds transferred were commingled with the general funds of the parent; (5) there was no identification of the FDA in the books and records of the parent or in the financial statements; (6) the funds were used primarily for non-funded depreciation purposes including the operating expenses of the parent, etc.; and (7) the parent's adoption of a resolution on August 30, 1989 reaffirming the existence of the FDA is

effective as of that date and not retroactively.

(Tr. 37).

13. Stormont–Vail then requested review by the Administrator. In affirming the PRRB, the Administrator concluded that:

> [T]he Intermediary, as affirmed by the Board, properly found that the Provider failed to establish an FDA after transfer of the funds to the parent corporation. Because the funds were withdrawn from the Provider's FDA for impermissible purposes as set forth at § 226.B of the PRM, the Intermediary properly reduced the interest expense incurred by the Provider prior to the transfer, for the FYE September 30, 1986 period, by the investment income earned on the funds while on deposit in the FDA during that time. Likewise, as the funds failed to retain the interest offset shelter as an FDA upon transfer to the related party, the Intermediary properly offset the income earned on the transferred funds by the related party against the Provider's interest income for the applicable period. Thus, the Administrator holds that the Intermediary properly used the remedies available to recapture previously sheltered interest income on funds withdrawn for a non-FDA purpose and to offset interest income for the cost years following the transfer of funds to the related party.

(Tr. 6). The Administrator's decision being the final decision of the Secretary, jurisdiction for this appeal properly resides in this court. 42 U.S.C. § 1395oo(f)(1).

## ANALYSIS

■ The present case turns entirely on the income offset rule and one of the exceptions to it. The rule can be summarized in these terms:

> To discourage providers from seeking Medicare reimbursement for interest on funds borrowed for capital acquisitions while also collecting income on their investments, Medicare regulations include an income offset rule, which requires that interest expense, to be considered "necessary," must be reduced by investment income. 42 C.F.R. § 413.153(b)(2).

*Pleasant Valley Hosp., Inc. v. Shalala,* 32 F.3d 67, 69 (4th Cir.1994). "The regulations thus limit a provider's reimbursement for interest expense to the net cost of borrowing." *Monongahela Valley Hosp., Inc. v. Sullivan,* 945 F.2d 576, 591 (3rd Cir.1991). The exception relevant here is that investment income from an FDA is not used to reduce the allowable interest expense. 42 C.F.R. §§ 413.134(e) and 413.153(b)(2)(iii).

Relying on this rule and exception, the Intermediary made two adjustments at issue here. The first adjustment was for the fiscal year ending September 30, 1986. The Intermediary reduced Stormont–Vail's interest expense by the income earned on its FDA account prior to the transfer of funds in March of 1986. The Intermediary's reason for this adjustment was that Stormont–Vail's transfer in March constituted a withdrawal of FDA funds for impermissible purposes under § 226.4(B) of the PRM.

The second adjustment was for the cost reporting periods after the transfer of funds in March of 1986. The Intermediary determined that Stormont–Vail's transfer to SVHSC was a transfer to a related party, that the interest income earned by SVHSC on those funds was chargeable to Stormont–Vail, and that neither SVHSC nor Stormont–Vail had established an FDA account with those funds after the transfer until SVHSC passed a resolution in 1989.

*First Adjustment*

Both sides agree that SVHSC and Stormont–Vail are related organizations within the meaning of 42 C.F.R. § 413.17. Nor is there a dispute that Stormont–Vail's reimbursable interest expense must be offset by SVHSC's interest income unless the interest income comes from an FDA. *See Monongahela Valley Hosp., Inc.,* 945 F.2d at 592. This leaves as the central issue whether Stormont–Vail's transfer of the FDA to SVHSC was an impermissible withdrawal.

The PRM at § 226.4(B) on the topic of "Withdrawals from the Funded Depreciation Account" provides, in relevant part:

When funded depreciation is used by the provider for other than (1) the acquisition of depreciable assets used to render pa-

tient care; (2) investments; (3) loans to the general fund for current operating costs related to patient care; or (4) other capital purposes as described in § 226, the investment income earned on these funds while on deposit in the funded account shall be used to reduce allowable interest expense incurred during all cost reporting periods subject to reopening.

Stormont–Vail argues it did not make an impermissible withdrawal from its FDA when it gave the FDA to its parent corporation. Stormont–Vail bases its argument on the PRM provision at § 226(D), which states:

When a provider invests or transfers the assets of the fund to a home office of a chain organization or to the motherhouse or governing body of a religious order or to other related parties, these assets shall be treated as the provider's fund and are subject to all the provisions of § 226ff.

Stormont–Vail maintains it made a "transfer" under § 226(D) rather than a "withdrawal" under § 226.4 when it turned over the FDA funds to SVHSC.

Stormont–Vail's argument is more semantics than substance. First, § 226(D) speaks only to how Medicare will view the ownership of the assets in an FDA when the provider transfers them to a related organization. It says nothing about those assets retaining the character of an FDA after the transfer. The character of an FDA account is principally a function of how it is used rather than who owns it. *Cf. Monongahela Valley Hosp., Inc.,* 945 F.2d at 592 ("The concept of funded depreciation, ..., requires that providers firmly commit to use clearly identified funds only for the acquisition of depreciable assets or other capital purposes related to patient care.") Second, an impermissible withdrawal occurs when the FDA is "used by the provider for other than" one of the four expressly permitted purposes. PRM § 226.4(B). Stormont–Vail has no tenable ground for disputing that it "used" the FDA when it turned those funds over to SVHSC. Consequently, Stormont–Vail's withdrawal is impermissible unless it qualifies as a permitted transfer.

■ Substantial evidence supports the defendant's finding that Stormont–Vail did not transfer the approximately $8.8 million from

its FDA for one of the purposes permitted by PRM § 226.4(B). Stormont–Vail's board adopted resolutions[3] and entered into transfer documents[4] which did not require, specify or otherwise provide[5] for those funds continuing as an FDA. Instead, the documents allowed SVHSC to use and apply the funds in any way directed by SVHSC's board. The board for SVHSC, however, never attempted to specify or designate those funds as an FDA until August of 1989. The evident purpose for Stormont–Vail's transfer was the recapitalization of SVHSC in order that SVHSC could achieve the objectives behind reorganization, including the acquisition of other subsidiaries. Indeed, Stormont–Vail does not even attempt to argue that its transfer of the FDA to SVHSC was a withdrawal for a permissible purpose.

After the transfer, SVHSC treated these funds as if they were working capital rather than an FDA. SVHSC's financial reports recorded these transferred funds as "contribution to capital," "General Fund Cash," and "General Fund Certificates of Deposit." (Tr. 161). In short, SVHSC did not timely identify or designate these funds in its books or reports as an FDA but commingled them with its other general funds. Any argument that SVHSC impliedly understood the funds were designated for FDA is contradicted by the evidence concerning SVHSC's actual use of the funds. Stormont–Vail has admitted that SVHSC used some of the funds in a manner not permitted by PRM 226 or consistent with an FDA. (Tr. 32, ¶ 6).

The Administrator construed and applied the relevant regulations and PRM provisions concerning related organizations and imper-missible withdrawals in a manner that is reasonable and consistent with statutory authority. It is neither illogical nor arbitrary that a provider's unconditional transfer of FDA funds to a parent corporation for its unrestricted use would result in the provider's impermissible withdrawal of FDA funds. Finally, the court believes the Administrator's conclusion of an impermissible withdrawal is based on a reasonable consideration of the relevant factors and is sustained by substantial evidence. The court does not find the Administrator's first adjustment to be erroneous.

*Second Adjustment*

The Intermediary here determined that Stormont–Vail transferred its FDA to a related organization and that neither the provider nor the parent corporation took any steps to preserve or create an FDA with those funds until SVHSC passed its resolution in August of 1989. Consequently, the interest income earned on those funds held by SVHSC was offset against Stormont–Vail's reimbursable interest expense. As was true for the first adjustment, both sides agree with respect to the second adjustment that SVHSC and Stormont–Vail are related organizations and that SVHSC's interest income from the transferred funds must offset Stormont–Vail's interest expense unless those funds are an FDA. The dispute here lies with whether the requirements for an FDA were met by SVHSC and Stormont–Vail.

For funds to be sheltered from the income offset rule, "two crucial requirements" specified in the PRM at § 226 must be met: "(1) the clear identification and seg-

---

3. In January of 1986, the Stormont–Vail's board adopted a resolution providing in relevant part that a "transfer out of the liquid assets of Stormont [Stormont–Vail] its endowment funds, together with additional liquid assets in the amount of eleven million dollars;" and that this "transfer ... will promote the objects and purposes of the reorganization." (Tr. 263).

4. In relevant part, the transfer document provided for the transfer "by gift" of these funds "out of the general funds of" Stormont–Vail. (Tr. 268). This document also specified that upon "delivery" of these funds they would "become and remain the sole and exclusive property of Transferee [SVHSC] to be used and applied as directed by or in accordance with policies adopted by the Board of Directors of Transferee [SVHSC], limited only by the provisions of the Articles of Incorporation and Bylaws of transferee [SVHSC]." (Tr. 268). In this document, Stormont–Vail also represented that these funds were "not encumbered by any commitment, restriction, lien or encumbrance to which Transferor [Stormont–Vail] is subject." (Tr. 268).

5. In fact, Stormont–Vail's board did make restrictions upon the endowment fund at the time of transfer. (Tr. 271). The plaintiff offers no cogent reason for not similarly imposing a restriction with respect to the funds transferred from its FDA.

regation of funds; and (2) the commitment that the funds will be devoted exclusively to 'the acquisition of depreciable assets used in rendering patient care or for other capital purposes related to patient care.'" *Monongahela Valley Hosp., Inc.,* 945 F.2d at 592 (citation omitted). There is substantial evidence to sustain the defendant's finding that these requirements were not met.

Since Stormont–Vail transferred these funds without condition or restriction and gave SVHSC's board the complete discretion to use these funds, it was incumbent on SVHSC then to identify and designate these funds as an FDA. This was finally done in August of 1989. It seems neither arbitrary nor capricious that the Administrator did not find that the funds were an FDA simply because SVHSC held the funds in certificates of deposit not unlike Stormont–Vail had done prior to the transfer. The unrestricted transfer of the funds in 1986 was ample grounds for the Intermediary to question now the designation of those funds. A strict and formal enforcement of the identification, segregation, and commitment requirements under these circumstances is both reasonable and rational. One court has observed:

> The simplistic description ... [in the regulations] makes clear that Providers have every incentive to characterize their accounts as funded depreciation and thus avoid offset of funded depreciation investment income against otherwise reimbursed interest expense. A slightly formalistic application of the regulation is a fine way of guarding against abusive characterization of assets as funded depreciation. Requiring a clear identification and separation of funds allows for the special goals of funded depreciation without frustration of the Medicare program's other purposes. Furthermore, the Secretary and the Review Board have been consistent in following this interpretation of the regulations. (citations omitted).

*Board of Trustees of Clinton County Hospital v. Shalala,* No. 91–1298–C, 1994 WL 715911 (S.D.Ind. Aug. 26, 1994).

■ Finally, substantial evidence exists to support the Administrator's finding that the funds were used in part for purposes outside the permitted scope of an FDA. In its position paper to the PRRB, Stormont–Vail admitted that "some of the transactions were not consistent with a funded depreciation account and would therefore represent improper withdrawals." (Tr. 505). That SVHSC may have also used the funds for proper FDA purposes does not erode the substantial underpinning of the Administrator's finding.

Having fulfilled its duty and reviewed the agency action on the grounds as challenged, the court affirms. The facts and arguments of record do not show the agency to have acted arbitrarily and capriciously, abused its discretion, or otherwise acted not in accordance with law.

IT IS THEREFORE ORDERED that the defendant's actions herein judicially reviewed are affirmed.